**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA, ex rel., RUQIAYAH MADANY and JOHN B. COLLINS and RUQIAYAH MADANY and JOHN B. COLLINS individually,

Plaintiffs,

v.

MUHAMMAD SHAHAB; CHIRADEEP GUPTA, a.k.a. CHIRADEEP DUTTA GUPTA, CHIRADEEP DATTA GUPTA, and CHIRADEEP DUTTAGUPTA; TAQUIR AHMED, a.k.a. TAUQEER AHMED; HASSAN AKHTAR; NUSRAT ALI; NAHEED BAQI; JOHN CINOL; CHRISTOPHER COLLINS; MUHAMMAD FORCON-ALHUK; MEHRAN JAVIDAN; FARAH KHAN; MUHAMMAD ZAHID-ABRAR KHAN; HASSAN MANSOOR; VIJAY MISHRA; RANA NAEEM; TELISH PATEL, a.k.a. TILESH PATEL; SHERRY PRESCOTT; SREE RVAL; RAHAT SHAHAB; MAIRA SULEMAN; JOHN THOMAS; TIMOTHY TUCKER; JOHN AND JANE DOES 1-99; ACURE HOME CARE, INC.; ALL AMERICAN HOMECARE, INC.; CARE PLUS HOME HEALTH CARE, INC.; EMBRACE HOME HEALTH CARE; FAMILY ALLIANCE HOME HEALTHCARE, LLC; GOLDEN AGE HOME HEALTH CARE, INC.; PATIENT CHOICE HOME HEALTHCARE, INC.; DEFENDANTS XYZ COMPANIES 1-99; LAURA BARRETT; COMMUNITY LIAISON SOLUTIONS, LLC; CONSUMERS CHOICE COMMUNITY LIAISON, LLC; JOHNNY HENRY; MIRA JONES; RANA KHAN; MALLORY MARKETING, LLC; CURTIS MALLORY; GREG POOLE; GUY ROSS; SHANNON COMMUNITY LIAISON, LLC; RICHARD SHANNON; LATRICIA DIXON; ABC MARKETING COMPANIES 1-99; JOHN AND

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**

**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER**

Case No. 2:09-CV-13693
Honorable Paul D. Borman

JANE MARKETERS 1-99; HOME VISITING GROUP, INC.; FRIEDERICH DUTKA; MOHAMMED ELFFILLAH; ROHANE PATEL; PAUL PETRE; HOME CLINIC P.C.; HOME CLINIC GROUP P.C.; PRAMOD RAVAL; VICTOR SAVINOV; JOHN AND JANE DOCTORS 1-99; TOTAL CARE PHYSICAL THERAPY AND REHABILITATION, INC.; UNICARE REHABILITATION, INC.; DEFENDANTS DEF THERAPIST STAFFING COMPANIES 1-99; TIRUPATHIREDDY ALLALA; EJAZ CHAUDRY; FAISAL CHAUDRY; TARIQ CHAUDRY; DATHATRYA KANDGARI; ROBERT LAGE; NAGA MADDALI; VISHNUPRADEEP MEDA; VIPIN REDDY MUPPIDI; CHINTU PHILLIP; JOSEPH M. PIOUS; CHAMALA PRATYUSH; RAMNARESH RAJULAPATI; SEELAM SRINIVASU; ABBAS SHAH; JESSICA VIRGIL; PARESH VYUS; JOHN AND JANE THERAPISTS 1-99; JOHN AND JANE PATIENTS 1-20,000; AAA MARKETER & CONSULTANT, LLC; ANTHEM MANAGEMENT AND INVESTMENT, INC.; MARS MANAGEMENT & CONSULTANT, LLC; OFFICE MANAGEMENT & CONSULTANT, LLC; PARAMOUNT CONSULTATION AND MANAGEMENT, INC.; and GHI COMPANIES 1-99,

Defendants.

**COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3732, AND COMMON LAW THEORY OF UNJUST ENRICHMENT**

**TRIAL BY JURY REQUESTED**

Pursuant to 31 U.S.C. § 3730(b)(1), Ruqiayah Madany and John B. Collins (collectively, the "Relators"), for themselves and on behalf of the United States of America, by their attorneys, bring this civil action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* (also known as the "FCA"), and the common law theory of unjust enrichment. This case arises from Defendants'

practices of (1) paying physicians, marketers, and patients kickbacks to secure Medicare reimbursement in violation of the physician self-referral and anti-kickback prohibitions, (2) falsifying certifications and patient visit notes, so as to receive reimbursements from Medicare for unnecessary and often unperformed home health services, and (3) rotating and referring patients among the Defendants to disguise those fraudulent schemes. To support the claims for this fraudulent conduct, Relators allege as follows:

## FILING UNDER SEAL

8. Under the FCA, this Complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within sixty (60) days after the Government receives the Complaint.

9. Prior to the filing of this Complaint, Relator Madany voluntarily submitted a written disclosure via a letter summarizing the alleged conduct (subject to the attorney-client privilege) to the United States Government, via the Assistant United States Attorney's Office in the Eastern District of Michigan, containing material evidence and information in her possession pertaining to the allegations contained in this Complaint. Relator Madany also confidentially notified the Office of the Inspector General ("OIG") and Federal Bureau of Investigation ("FBI") of her filing intentions.

## DEFENDANTS' SCHEMES

10. Defendants have conspired to defraud the United States by repeatedly creating and submitting false or fraudulent statements, records, claims and other documents in order to obtain payments from the United States purportedly for providing home health agency care to Medicare beneficiaries.

11. The Medicare claims for home health care were illegal, unauthorized, and improper because, among other things, (a) such services were provided, if at all, as a result of patient referrals received in exchange for improper kickbacks to the marketers, physicians and patients, (b) the home health services on which the claims are based were not performed or were provided, if at all, in a manner not in compliance with various Medicare regulations, requirements, and conditions.

12. Defendants concealed these material facts to avoid detection of their unlawful conduct, and to otherwise conceal, avoid, and/or decrease obligations to repay or refund the monies to the United States.

13. Relator Collins began his employment with Defendant All American Homecare, Inc. ("All American") in December 2008 and he is currently an Assistant Administrator and Treasurer of All American. Relator Collins responsibilities included assisting the Individual and Corporate HHA Defendants in the billing and management of All American and other Corporate HHA Defendants.

14. Relator Madany began her employment with Defendant Embrace Home Health Care ("Embrace") and All American in or about November 2008 and was terminated in or about May 2009. Relator Madany's job duties consisted of billing data entry, administrative assistance and reception duties.

15. Throughout their employment, Relators became aware of multiple fraudulent practices by the Defendants, including improper and illegal kickbacks, false certification of necessary care for patients and falsifying treatment notes. In addition, Relators learned of Defendants' efforts to cover up such fraudulent schemes.

16. Since in or about 2006 and continuing through the date of this Complaint, Defendants have conducted and profited substantially from false and fraudulent schemes to defraud the Medicare program through certain common and coordinated operations and practices implemented at a series of related HHAs in the Detroit metropolitan area, including the regular production of false or fraudulent statements, claims, records, and other documents constituting, supporting, or relating to claims submitted to the United States for payment through the Medicare program. Defendants have also provided improper and illegal kickbacks to "marketers," physicians and patients.

17. Beginning in or about 2006, one or more of the Individual HHA Defendants identified *herein* have purchased, established, or gained control of at least seven home health care companies. Specifically, these companies include Acure Home Care, Inc.; All American Homecare, Inc.; Care Plus Home Health Care, Inc.; Embrace Home Health Care; Family Alliance Home Healthcare, LLC; Golden Age Home Health Care, Inc.; and Patient Choice Home Healthcare, Inc. (referred to collectively herein as "the Corporate HHA Defendants").

18. Each of the Corporate HHA Defendants is located in the Detroit metropolitan area. Six of the seven companies have their offices located in the same building, 21700 Greenfield Road in Oak Park, Michigan.

19. At each of the Corporate HHA Defendants, the Individual HHA Defendants have implemented or caused to be implemented a common and coordinated set of fraudulent business strategies and practices. Stated generally, these schemes consist of the following:

a. the use of "marketers" to solicit and/or recruit prospective Medicare-eligible patients, regardless of whether those patients were homebound, whether the care is necessary, or whether there care is actually provided.

b. such marketers were provided a kickback payment on a per patient basis;

c. the offering and provision of monetary and other remuneration to patients so that they will sign up to receive reimbursable care from the Corporate HHA Defendants and/or so that they will sign false or fraudulent documentation of the provision of such services, regardless of whether those patients were homebound, whether the care is necessary, or whether the care was even provided;

d. the solicitation, receipt, and use of home health care referrals from physicians who have not or have not yet examined the patient or where home health care is not medically necessary;

e. the solicitation, creation, and compilation of false or fraudulent certification and documentation of home health care services allegedly provided to patients;

f. the cover up of the fraud by (1) disguising those kickbacks to physicians, marketers and patients, and (2) the "recycling" of patients among the Corporate HHA Defendants, in other words, circulating patient discharge lists between and among the various companies so as to result in the sequencing of multiple 60-day episodes of care, each with a different home health care company for the purpose of evading detection of the fraudulent practices;

g. the submission of RAPs and claims for payment by Medicare for services that were not in fact rendered or were rendered in less quantity or scope than that claimed; and

h. the submission of RAPs and claims for payment by Medicare for services that were rendered, if at all, as a result of the arrangements and practices detailed *supra* in subparagraphs 140(a) through (f);

**Organization and Coordination of the HHAs**

20. Each of the Corporate HHA Defendants are owned and/or managed by varying combinations of the Individual HHA Defendants.

21. All or nearly all of the patients enrolled by each of the Corporate HHA Defendants are eligible for Medicare.

22. All or nearly all of the income of each of the Corporate HHA Defendants is the result of payments received from Medicare.

23. Irrespective of whether he is identified as an owner or managing employee in submissions to the Michigan Department of Energy, Labor & Economic Growth and/or CMS, Muhammad Shahab has maintained an effective ownership interest in and/or exercised control over the operations of each of the Corporate HHA Defendants during the times relevant to this Complaint.

24. As to each of the Corporate HHA Defendants, Muhammad Shahab has exercised his effective ownership and control of those companies in various manners, including but not limited to:

a. accessing the offices and records of the Corporate HHA Defendants;

b. hiring and firing employees for the Corporate HHA Defendants;

c. assigning and/or moving employees to and between the Corporate HHA Defendants;

d. maintaining access to and/or signatory authority on the Corporate HHA Defendants' bank accounts;

e. obtaining blank checks drawn on the accounts of the Corporate HHA Defendants and signed by individuals designated as officers or managing agents of the Corporate HHA Defendants;

f. demanding and obtaining information about the Corporate HHA Defendants' patients and activities;

g. signing the name(s) of individuals designated as officers or managing agents of the Corporate HHA Defendants to checks, agreements, and/or other documents; and

h. directing the business activities and practices of the Corporate HHA Defendants, including what patients to enroll and bill for, how to document financial and patient care matters, and which physicians and therapists to use.

25. Relator Collins was hired to work for All American by Muhammad Shahab.

26. At the time he was hired, Shahab told Relator Collins that Hassan Akhtar (then the Administrator of All American) would be training him to be the new Administrator and that Akhtar was being "promoted" to serve as the supervising biller for all of the companies within Shahab's operation.

27. Shahab told Relator Collins not to be too focused on the unique operations of All American because Shahab wanted Relator Collins to learn the business and eventually help Shahab manage his operations as a whole.

28. Since at least December 2008, Muhammad Shahab has regularly held and/or conducted meetings with various of the Individual HHA Defendants and/or the staff of the Corporate HHA Defendants.

29. Muhammad Shahab regularly meets with and/or communicates directions or instructions to employees of each of the Corporate HHA Defendants.

30. Muhammad Shahab has, on multiple occasions, called a staff meeting at the offices of one of the Corporate HHA Defendants and requested that staff members of all of the other Corporate HHA Defendants attend.

31. Since at least December 2008, Muhammad Shahab has regularly held meetings of management-level representatives of the Corporate HHA Defendants to discuss, among other things, the status and coordination of their respective activities.

32. Muhammad Shahab has referred to these gatherings as "ownership meetings" or "management meetings."

33. These "ownership" or "management" meetings are typically held on Saturday mornings at 21700 Greenfield Road in Oak Park, Michigan.

34. Those who have attended these Saturday morning meetings since December 2008 include Muhammad Shahab, Relator Collins, Christopher Collins, Muhammad Forcon-Alhuk, Chiradeep Gupta, Mehran Javidan, Hassan Mansoor, Sree Rval, and Rahat Shahab.

**Recruitment of Patients**

35. Defendants Muhammad Shahab, Laura Barrett, Christopher Collins, Community Liaison, Consumers Choice, Dixon, Haile, Henry, Jones, Khan, Mallory, Mallory Marketing, OMC, Poole, Ross, Shannon, Shannon Community Liaison, ABC Marketing Companies 1 through 99, and John and Jane Marketers 1 through 99 (referred to collectively herein as "the

Marketer Defendants") have all solicited or recruited persons to enroll as patients with one or more of the Corporate HHA Defendants.

36. Individuals engaged in direct patient recruiting efforts are referred to as "marketers."

37. In soliciting or recruiting patients, each of the Marketer Defendants have communicated to patients that the patients will receive a monetary payment or other thing of value if they agree to enroll to receive home health care services with the Corporate HHA Defendants.

38. In soliciting or recruiting patients, each of the Marketer Defendants also received monetary payment or some other thing of value on a per patient basis and were required to reimburse the Corporate HHA Defendants if a patient failed to stay enrolled for an entire 60 day episode.

39. When they agreed to sign up to receive home health care services through one or more of the Corporate HHA Defendants, each of Defendants John and Jane Patients 1 through 20,000 knew and understood that he or she would be receiving a monetary payment or other thing of value in exchange for doing so.

40. Many of Defendants John and Jane Marketers 1 through 99 are otherwise unemployed individuals and are themselves current or former patients of one or more of the Corporate HHA Defendants.

41. Each of the Marketer Defendants directed their recruitment efforts specifically at persons who claim or are believed to be enrolled in Medicare, regardless of whether those patients were homebound and would qualify for home health care.

42. Whether a person is or appears to be in fact homebound or actually in need of home health care services is not a criteria considered by the Marketer Defendants in identifying prospective patients.

43. Barrett, Jones, and certain of John and Jane Marketers 1 through 99 produce patients to be enrolled with the Corporate HHA Defendants by utilizing their control over or access to adult foster care (AFC) homes.[1]

44. Once a Marketer Defendant identifies a prospective patient, the Marketer Defendant communicates the person's name and pertinent medical and/or Medicare information to the Corporate HHA Defendants.

45. The Corporate HHA Defendants then verify the patient's information to confirm that they are enrolled in Medicare.

46. If the patient is confirmed to be enrolled in Medicare, the Corporate HHA Defendants proceed to process the patient in anticipation of submitting a claim to Medicare.

47. The Corporate HHA Defendants, the Individual HHA Defendants, and/or OMC compensate or cause to be compensated both the marketer and the patient.

48. The amount paid to the Marketer Defendant is calculated on a per-patient basis and has ranged from $300 to as much as $1,000 per patient.

49. The patient is typically paid in cash. At times, however, patients have been compensated with a prescription for drugs.

50. The amount and timing of the payments to patients and the identity of the individual delivering the payment have varied from patient to patient and from marketer to

[1] AFC homes are group residences providing assisted living for the aged, developmentally disabled, mentally ill and physically handicapped.

marketer. However, the Defendants know and understand that patients have been and are being paid in order to enroll as patients of the Corporate HHA Defendants.

51. In spring of 2009, Relator Madany placed phone calls to patients in order to conduct a patient satisfaction survey. At that time, she spoke with one of the Defendants John and Jane Patients 1 through 20,000, whose name is being withheld from this Complaint for the purpose of confidentiality. That patient informed Relator Madany that he never saw a treating therapist and only saw Defendant Shabad who provided him with money for enrolling with the Corporate HHA Defendants.

52. On May 4, 2009, Relator Madany was approached by Muhammad Shahab to be a marketer. Relator was informed that she would receive $400 per patient that she enrolled with the Corporate HHA Defendants. Relator Madany, however, never marketed for Shahab.

53. Relator Madany is also aware of instances where Marketer Defendants provided patients with enrollment paperwork for that patients signature prior to any assessment of that patient by a physician.

54. In fact, many patients were not homebound, as required for HHA care. Both Relators witnessed numerous patients physically come into the Defendants offices in Oak Park, Michigan to collect their monetary kickback from certain Defendants.

55. In addition, some of the Marketer Defendants, despite canvassing the neighborhoods and soliciting patients for the Corporate HHA Defendants, were also certified as home bound patients, themselves, by the Defendants.

56. In or about April 2009, Muhammad Shahab set up OMC to serve as a single point of contact to which the Marketer Defendants could bring patients for all of the Corporate HHA Defendants. OMC was also intended to facilitate coordination of patient assignments

among the Corporate HHA Defendants and payment of the Marketer Defendants and the patients.

57. In or about April 2009, Muhammad Shahab instructed Greg Subastian, an AT&T employee, to install cables and wiring connecting the computers of OMC, Acure, All American, Embrace, and Patient Choice so that OMC could have access to each HHA's patient database.

**Creation of False or Fraudulent Documentation to Support Medicare Claims**

58. Once a patient is identified and his or her Medicare status confirmed, a collection of documents is prepared. This collection is referred to as an "opening" or "starter" package or kit. Included within the opening package are a Patient Referral/Intake Form, an OASIS Form, a plan of care form (CMS Form 485), and 18 patient revisit forms.

59. A physician's signature is required on the Patient Referral/Intake Form and on the plan of care form (CMS Form 485), the signature of a registered physical therapist is required on the OASIS Form and the plan of care form (CMS Form 485), and the signature of a registered physical therapist or a physical therapy assistant is need on the revisit forms.

60. Defendants Home Visiting Group, Dr. Dutka, Dr. Patel, Elffillah, Dr. Petre, Home Clinic, Home Clinic Group, Dr. Raval, Dr. Savinov, and John and Jane Doctors 1 through 99 (referred to collectively herein as "the Physician Defendants") are individuals who have held themselves out as physicians and/or clinics who hold themselves out as staffed by physicians that have signed, caused to be signed, or permitted to be signed in their name false or fraudulent documentation relating to patients for whom the Corporate HHA Defendants have submitted claims for payments from Medicare.

61. The Physician Defendants are selected by the Corporate HHA Defendants and/or the Individual HHA Defendants with the knowledge and expectation that they will sign or allow

their name to be signed documents relating to home health care after little or no examination of the patient and irrespective of whether the patient can reasonably be determined to be homebound and/or in need of the home health care services purportedly offered by the Corporate HHA Defendants.

62. Each of the Physician Defendants has signed or caused to be signed or allowed to be signed in their name Patient Referral/Intake Forms and plan of care forms (CMS Form 485) without or prior to examining the patient.

63. Each of the Physician Defendants has signed or caused to be signed or allowed to be signed in their name Patient Referral/Intake Forms and plan of care forms (CMS Form 485) despite knowing that the patient could not reasonably be classified as homebound and/or that home health care services were not reasonably medically necessary, or in reckless disregard or in deliberate ignorance of such facts and circumstances.

64. Each of the Physician Defendants has done so with knowledge that the Corporate HHA Defendants and/or the Individual HHA Defendants would submit claims for payment to Medicare based upon the forms signed by the Physician Defendant, or in reckless disregard or in deliberate ignorance of such facts and circumstances.

65. Dr. Raval provided Muhammad Shahab with one or more blank physician referral forms containing nothing but his own undated signature.

66. The Corporate HHA Defendants have on more than one occasion prepared 25 to 30 referral forms in advance for Dr. Savinov's signature. Someone—occasionally a runner, but often Muhammad Shahab himself—has then come by the office and picked up the forms. The forms are then returned—typically the same day or the following day—with Dr. Savinov's signature on all of them.

67. Elffillah, though not himself a doctor, has represented himself to be Dr. Patel and signed Patient Referral/Intake Forms and plan of care forms (CMS Form 485) in Dr. Patel's name.

68. In addition, Dr. Patel has signed or caused to be signed in his name prescriptions (often without a date, patient name, or medication name or dosage) and provided such prescriptions to the Corporate HHA Defendants and/or the Individual HHA Defendants knowing that they would be given to prospective patients of the Corporate HHA Defendants, or in reckless disregard or in deliberate ignorance of such facts and circumstances.

69. Akhtar had a regular practice of providing the Marketer Defendants with blank opening packages. The Marketer Defendants would then return the packages with the signatures of the patients appearing in the appropriate places, but otherwise undated and not completed. Akhtar would then produce a photocopy of blank Patient Referral/Intake Form bearing Dr. Raval's signature and dictate to someone else in the office (including, in some instances, Relator Collins) the patient's information and diagnosis.

70. In early 2009, Relator Collins began to question both Muhammad Shahab and Akhtar about these practices and activities. Relator Collins was generally told "not to worry about it." Shahab told Relator that they had "verbal authority" from Dr. Raval to open patients in this manner. Shahab explained that the Patient Referral/Intake Form bearing a photocopy of Dr. Raval's signature was necessary "in case Medicare asks" and that Sherry Prescott would follow up with Dr. Raval and get his original signature on a form later.

71. Shahab also explained to Relator Collins that because of the types of patients they were dealing with, it was necessary to get the paperwork completed and the claim billed as quickly as possible. Shahab stated that the marketers would try to sell the patient information to

other companies so it was important to get the bill submitted so as to lock that particular patient in.

72. Relator Collins asked Shahab if he could meet Dr. Raval. Shahab responded that this was not necessary and stated that he was the one who dealt with Dr. Raval.

73. After Hassan Akhtar left All American in or about February or March 2009, Relator Collins instructed All American employees that they should not open a patient before a referral was received from the doctor. Muhammad Shahab objected to this change and stated that the billings should be processed based on the doctor's verbal orders. Relator Collins stated that he was not aware of any verbal orders and that no doctor had called in. Accordingly, Relator Collins insisted that no patients be opened or billings submitted without a physician referral.

74. In or about March 2009, Muhammad Shahab brought an individual into the All American office and identified him as "Dr. Ali." Shahab stated that Dr. Ali and "his group" were opening up an office in "our building." Relator Collins later understood the "group" being referenced to be Defendant Home Visiting Group.

75. Shahab stated that Dr. Ali was working with four or five other doctors and that they would be able to see all of "our patients." Shahab directed everyone to accordingly send all of their referrals to Dr. Ali.

76. Shahab instructed Relator Collins and/or Sherry Prescott to fax referrals to Dr. Ali and gave him his fax information.

77. That same day, Relator Collins asked Sherry Prescott to contact Dr. Ali and get the full names, license numbers, and MPI numbers of the doctors in his group.

78. Relator Collins did not receive any information in response to this request.

79. All American sent approximately ten referrals to Dr. Ali and Home Visiting Group, but after receiving no licensing information about the Group's physicians Relator asked Sherry Prescott to reassign those patients to Dr. Savinov.

80. After the Home Visiting Group's suite opened, Shahab pulled together the owners and managers of his companies and brought them down to the suite, introduced 4 or 5 people, and repeated his instructions that all patients be referred to these doctors.

81. Relator Collins again asked for the names and licensing information of the physicians and directed the staff at All American not to utilize the Home Visiting Group until something was received.

82. As a result of this second request, Relator Collins only received information about one physician, Dr. Dutka.

83. The only referrals Relator Collins ever saw from Home Visiting Group were signed by Dr. Dutka.

84. Relator Collins was told by an individual who Akhtar was training to be a biller for Acure that the individual identified as "Dr. Ali" was not, in fact, a doctor, but instead a marketer.

85. Relator Collins directed the All American staff not to accept referrals from the Home Visiting Group, but these instructions were overridden by Muhammad Shahab and Christopher Collins.

86. Each of the Physician Defendants has received compensation from or on behalf of the Corporate HHA Defendants and/or the Individual HHA Defendants.

87. Muhammad Shahab, AAA Marketer, MARS Management, and/or OMC have compensated or caused to be compensated the Physician Defendants by virtue of monetary payments determined on a per-referral basis.

88. The compensation arrangement with Dr. Savinov was memorialized in a written agreement dated July 8, 2008. The agreement is between Dr. Savinov and MARS Management, a company owned and controlled by Muhammad Shahab. It provides that Dr. Savinov "will get $80 per visit for new patients and $60 for revisits." In addition, MARS Management agreed to provide Dr. Savinov with a leased car or van, insurance for said car or van, liability insurance, fuel expenses, the costs of a medical assistant or nurse, office rent, furniture, phone, fax, internet, and stationary. MARS Management also agreed to provide Dr. Savinov with "10% of the profit" on diagnostic tests conducted "through your referral."

89. The minutes of a "Share Holders Meeting for All American Homecare, Inc." occurring in or about August 2008 report "marketing costs" for each of a number of physicians calculated as a function of the number of patients and a specified rate. Specifically, the minutes read, in pertinent part, as follows:

- Marketing cost of Dr. Raval Pts.(41)=41x400 = $16,400.00
- Marketing cost for Dr. Patel Pts.(9)= 9x700 = $5,850.00
- Marketing cost for Dr. Paul Pts.(3)= 3X300 = $900.

90. On one occasion, while traveling to Dr. Petre's office, Muhammad Shahab told Relator Collins that after Dr. Petre's previous business had fallen apart, Shahab was now "financing his new operation," referring to Home Clinic, P.C. and Home Clinic Group, P.C.

91. In addition, each of the Physician Defendants have the opportunity to submit Medicare claims of their own for purportedly examining the patient, ordering home health

services, and establishing and/or approving a plan of care as well as any other services the Physician Defendant may or may claim to provide to the patient.

92. Relators have provided the Government with Patient Referral/Intake Forms and plan of care forms (CMS Form 485) that appear on their face to bear forgeries of Dr. Savinov's signature.

93. On various occasions, Dr. Raval's signature was forged on Patient Referral/Intake Forms and plan of care forms (CMS Form 485). In one instance, in June 2008, the office manager of Patient Choice was witnessed signing Dr. Raval's signature to such forms.

94. In or about March 2009, Muhammad Shahab asked several of the Individual and Corporate HHA Defendants to create a list of all of the patients for which Medicare claims had been submitted for home health care services purportedly provided under Dr. Raval's orders.

95. The purpose of this request was to assist Dr. Raval in coordinating his own records with those maintained by the HHA Defendants and to address concerns expressed by Dr. Raval that he was not being sufficiently compensated.

96. All American identified 58 individual patients in response to this request.

97. Of those 58, Dr. Raval had only actually seen 13.

98. Relator Madany was aware that Dr. Raval had not gone to see his patients. On various occasions, Dr. Raval's patients would call All American's offices to complain that they had not seen a doctor at all despite being enrolled in HHA care and being scheduled for visits by therapists.

99. Relators have provided the Government with Patient Referral/Intake Forms and plan of care forms (CMS Form 485) that appear on their face to bear forgeries of Dr. Raval's signature.

100. A physical therapist or physical therapist assistant (or other qualified provider where other home health services are at issue) must complete and sign other documents within the opening package, specifically the OASIS Form, the plan of care form (CMS Form 485), and the 18 patient visit forms.

101. Defendants Total Care, Unicare Rehab, Therapist Staffing Companies 1 through 99, Allala, Ejaz Chaudry, Faisal Chaudry, Tariq Chaudry, Kandgari, Lage, Maddali, Meda, Muppidi, Phillip, Pious, Pratyush, Rajulapati, Shah, Srinivasu, Virgil, Vyus, and John and Jane Therapists 1 through 99 (referred to collectively herein as "the Therapist Defendants") have each completed and signed or caused to be signed false and fraudulent documentation relating to home health care services provided or purported to be provided for, on behalf of, or under agreement with the Corporate HHA Defendants.

102. Only a small number of the Therapist Defendants are or have been employees of the Corporate HHA Defendants.

103. Instead, the Corporate HHA Defendants have utilized a common pool of physical therapists and physical therapist assistants working as independent contractors and/or through physical therapist staffing companies.

104. Allala, Ejaz Chaudry, Faisal Chaudry, Tariq Chaudry, Lage, Maddali, Meda, Muppidi, Shah, and Virgil have worked for some or all of the Corporate HHA Defendants as independent contractors.

105. Kandgari, Phillip, Pious, Pratyush, Rajulapati, Srinivasu, and Vyus have worked for some or all of the Corporate HHA Defendants through Total Care and/or Unicare Rehab.

106. One or more of the Therapist Defendants completes and signs the forms in the opening package where the signature of a physical therapist or physical therapist assistant is required.

107. At least one of the Therapist Defendants visits the patient.

108. The initial visit must be conducted by a registered physical therapist (as opposed to a physical therapist assistant).

109. However, Ejaz Chaudry, Lage and others among John and Jane Therapists 1 through 99 are registered physical therapists who have sent physical therapist assistants to conduct the initial visit and complete the documentation, but signed the documents themselves even though they did not complete them or visit the patient.

110. The initial patient visit should only occur after a physician has ordered home health care. However, in numerous instances the Therapist Defendants have visited the patient's home and/or completed the paperwork for the initial visit and plan of care prior to the date that the Physician Defendant signed the referral of the patient for home care.

111. In some instances the patient's signature on all of the required documents has been obtained and delivered by the marketer and the therapist(s) need only fill in the information and sign the documents themselves.

112. In other instances, one or more visits must be made to the patient by a therapist in order to obtain the required signatures.

113. The Therapist Defendants generally only make as many visits to the patient as are necessary to get the patient to sign all 18 revisit forms.

114. In some instances only the initial home visit is ever actually made and the patient signs all 18 revisit forms during that initial visit.

115. In other instances, two or more visits by the Therapist Defendants are needed to obtain the full complement of revisit forms.

116. In the event 60 days has passed and less than all 18 signed revisit forms have been obtained, the Individual HHA Defendants and/or the Corporate HHA Defendants instruct either the Therapist Defendant or the Marketer Defendant associated with the patient to obtain the remainder of the revisit forms so that the claim to Medicare will not result in a low-utilization payment adjustment (LUPA).

117. The Therapist Defendants generally do not date the signatures on the documents comprising the opening package and instruct the patients not to do so when signing the visit and/or revisit forms.

118. In some instances, the patient is paid additional sums of money to sign the visit and/or revisit forms.

119. Only minimal, if any, therapy services are actually provided to the patients. In all or nearly all instances the extent of the services actually provided is less than the services indicated on the documentation as having been provided.

120. The Therapist Defendants then provide pre-signed treatment forms for all future home visits to the Corporate HHA Defendants and typically do not return to treat the patient.

121. Many of those undated documents were provided to Relator Madany for processing and she was asked to "fill in" the dates and to post the documents on those future date. Ms Madany refused and she time-stamped those pre-signed documents the date she received them and provided them to the Government.

122. For example, Defendant Lage provided Relator Madany with pre-signed and undated treatment notes for allegedly future visits to those patients. Lage instructed her to find a

time in his future calendar to date and time the visit, regardless of whether he actually treated the patient.

123. There is no way that Lage could have provided all the treatments that were put into his calendar because it was completely booked from 6 a.m. until 9 p.m. at night with no breaks for eating, travel or other necessary activities in treating so many patients at their homes.

124. In April 2009, Relator Madany received a call from a patient, unnamed in this Complaint for the purpose of confidentiality, that complained that no therapist had been out to see him despite having been enrolled with one of the Corporate HHA Defendants for three weeks.

125. Relator Collins has observed Therapist Defendants affiliated with Total Care and/or Unicare Rehab come into All American's offices, sit down at a conference table, and fill out a stack of certifications and revisit forms.

126. In early 2009, Relator Collins began to question both Shahab and Akhtar about these practices and activities. Relator Collins was generally told "not to worry about it."

127. After Hassan Akhtar left All American, Relator Collins attempted to change many of the practices of All American with respect to the provision and documentation of physical therapy services.

128. Specifically, Relator Collins obtained assurances from the individual therapists used by All American that they were, in fact, seeing the patients. Relator Collins also instructed the therapists not to accept or prepare pre-completed opening packages and/or visit notes.

129. In or about July and August 2009, All American received at least three calls from patients or their caretakers, unnamed in this Complaint for the purpose of confidentiality, making complaints about Defendant Meda. Specifically, the callers reported being asked to sign "8 or

9," "a lot," and/or "a bunch" of visit notes during Meda's first visit and that Meda had visited rarely, if at all, since the initial visit.

130. Collins asked Billie Butts to pull Meda's charts and records to contact the patients to inquire as to whether he had come to see them and whether the charts matched what had actually been done.

131. This inquiry revealed a number of irregularities. Though Meda's records reported regular visits for each of the patients, all of the patients stated that Meda came infrequently or had not come at all recently. In the charting for one patient, Meda had included 2 revisit notes for the same date in three different instances. Meda had attempted to recertify one patient and represented that he had visited the patient on specific dates falling after the patient had been killed in a house fire. Meda also had documented visits to one patient for a period of time during which the patient was in the hospital. One patient only stated that Meda came "maybe once a week" and refused to talk any further about the matter. In the cases of six patients, Meda had claimed to have provided Transcutaneous Electrical Nerve Stimulation (TENS) theraphy but the patient reported never having received such treatment.

132. When confronted with these issues, Meda stated that he was under the impression that he worked for Muhammad Shahab and that "everybody was doing it."

133. Nevertheless, Meda disputed the claims of the patients and maintained his charts were accurate. He was asked to submit documentation or other information substantiating his claims, but stated that he could not gather anything that would be of help to himself or to All American.

134. Relator Collins instructed that no further cases should be assigned to Meda.

135. Each of the Therapist Defendants has completed, signed, or caused to be signed false and fraudulent documentation relating to the purported provision of home health care services by or on behalf of the Corporate HHA Defendants.

136. Each of the Therapist Defendants has done so with knowledge that the Corporate HHA Defendants and/or the Individual HHA Defendants would submit claims for payment to Medicare based upon the forms signed by the Physician Defendant, or in reckless disregard, and/or in deliberate ignorance of such facts and circumstances.

137. The Therapist Defendants are generally compensated by the Corporate HHA Defendants, the Individual HHA Defendants, Total Care, and/or Unicare Rehab on the basis of the number of visit and/or revisit forms that have been signed by the patient.

138. The Corporate HHA Defendants and the Individual HHA Defendants have received and acted upon documentation signed and/or caused to be signed by the Physician Defendants and the Therapist Defendants and have submitted claims to Medicare for payment for services.

**Submission of False and Fraudulent Billings to Medicare**

139. The Corporate HHA Defendants and Individual HHA Defendants have submitted or caused to be submitted to Medicare numerous RAPs and claims for payment based upon home health care services provided and/or documented in the manner described *supra* using UB-92 and UB-04 Forms or their electronic equivalents.

140. A representative of each of the Corporate HHA Defendants signed the Electronic Data Interchange Enrollment Form and obligated the Corporate HHA Defendants to the terms and conditions relating thereto.

141. Once an opening package had been completed, the Corporate HHA Defendant to which the patient had been assigned for that particular episode of care submitted an RAP to CMS and/or the RHHI requesting payment for an 18-visit episode of care.

142. The submission of the RAP constituted a representation that the patient had been referred by a physician to receive home health care, that a plan of care had been established, that the initial service visit had been completed, and that all terms, conditions, regulations, and requirements of the Medicare program had been satisfied.

143. Approximately 60 days later, the Corporate HHA Defendant to which the patient had been assigned for that particular episode of care submitted a claim to CMS and/or the RHHI requesting payment of the residual balance of the full episode rate.

144. The submission of the claim constituted a representation that the patient had been referred by a physician to receive home health care, that a plan of care had been established, that all of the claimed service visits had been made, and that all terms, conditions, regulations, and requirements of the Medicare program had been satisfied.

145. At all relevant times, each of the Defendants acted with knowledge, in reckless disregard, and/or in deliberate ignorance of the fact that Medicare would cover the cost of home health services only if the services had actually been performed, those services that were provided were medically justified, and those services that were provided were done so in a manner consistent with the statutes, regulations, and rules governing the Medicare program.

146. At all relevant times, each of the Defendants acted with knowledge, in reckless disregard, and/or in deliberate ignorance of the fact that if a final claim reported that less than all 18 of the visits called for by the plan of care were reported as having been actually made, CMS could potentially not pay the full episode rate, the claim could be subject to a low-utilization

payment adjustment (LUPA), and the Corporate HHA Defendant could be required to refund some or all of the initial payment made as a result of the RAP.

147. Relators have in their possession and have provided to the government false or fraudulent RAPs and claims for payment submitted by the Defendants.

148. An illustrative group of false or fraudulent RAPs and claims for payment submitted in the above-described manner include the following. For purposes of patient confidentiality, the names of the patients are not provided here. The patients are instead referred to by their unique Medicare Health Insurance Claim Number (HICN). Also provided are the dates of the episode of care with respect to which false or fraudulent documentation was prepared.

| | **HICN** | **Dates of Purported Episode of Care** |
|---|---|---|
| a. | XXXXXX823A | 7/11/08 to 8/31/08 |
| b. | XXXXXX812A | 7/28/08 to 9/25/08 |
| c. | XXXXXX142A | 8/8/08 to 10/6/08 |
| d. | XXXXXX712A | 9/7/08 to 11/5/08 |
| e. | XXXXXX895A | 9/16/08 to 11/9/08 |
| f. | XXXXXX952A | 10/12/08 to 12/8/08 |
| g. | XXXXXX244A | 11/10/08 to 1/8/09 |
| h. | XXXXXX687A | 12/9/08 to 2/4/09 |
| i. | XXXXXX552A | 12/13/08 to 2/4/09 |
| j. | XXXXXX319A | 11/23/08 to 1/21/09 |

**Covering up the Fraud: Concealing the Kickbacks**

149. Defendants have taken various steps to conceal or obscure the true nature of their unlawful business practices and conduct, and to avoid detection.

150. The annual cost reports for each of the Corporate HHA Defendants submitted to CMS do not disclose that each of the Corporate HHA Defendants have caused payments to be

made to physicians and patients, nor do they disclose that payments have been made to marketers on a per-patient basis.

151. Many of these improper expenditures are, however, included among the costs and expenses stated on each Corporate HHA Defendants' annual cost report disguised as payments to one or more of the various Consultant Defendants and/or Individual HHA Defendants.

152. For example, All American's 2008 cost report indicated approximately $869,000 in expenses for "Promotion," approximately $91,000 for "Consulting Services," and approximately $209,000 for "Outside Services—Administration."

153. These figures were comprised in substantial part of transfers to AAA Marketer, Anthem Management, Paramount Consultation, and SH Consultants.

154. Each of these entities was owned or controlled by one or more of the Individual HHA Defendants.

155. The payments to physicians, patients, and marketers were made out of these funds by Muhammad Shahab, Hassan Akhtar, Christopher Collins, and possibly others.

156. Payments to the Consultant Defendants were also used to distribute profits among the conspirators while concealing the financial and/or ownership interests of certain of the Individual HHA Defendants in certain of the Corporate HHA Defendants.

157. On information and belief, little or no management or consulting services were provided to the Corporate HHA Defendants by the Consultant Defendants and the payments exceeded the fair market value of any such services that were provided.

158. In fact, services that were provided by the Consultant Defendants actually constituted part of the conspiracy. For example, the role that OMC did perform was to serve as

the marketers' single point of contact for all of the Corporate HHA Defendants and the coordinator of patient assignments among the Corporate HHA Defendants. In addition, some of these funds were used to make unlawful payments to physicians, patients, and marketers.

159. Payments made from the Corporate HHA Defendants to Total Care and Unicare Rehab were also used to distribute profits among the conspirators while concealing the financial and/or ownership interests of certain of the Individual HHA Defendants in certain of the Corporate HHA Defendants.

160. The payments to Total Care and Unicare exceeded the fair market value of the physical therapy and physical therapy assistant staffing services that were provided by those companies to the Corporate HHA Defendants. Moreover, the physical therapy and physical therapy assistant staffing services that were actually provided largely consisted of the gathering and execution of false or fraudulent medical documentation for patient visits and services that did not, in fact, occur.

161. The inflated and/or overstated payments to Total Care and Unicare for what were typically fraudulent physical therapy services were included among the costs and expenses stated on each Corporate HHA Defendants' annual cost report.

162. In or about March 2009, All American received a letter from Trust Solutions, LLC, a CMS Program Safeguard Contractor, requesting that All American provide the medical records for 30 specified patients.

163. As a result of the March 2009 request from Trust Solutions, Muhammad Shahab requested that the documentation for these patients be "fixed."

164. Specifically, Muhammad Shahab requested that the marketers who had been associated with those patients go back to the patients and get them to sign new visit and/or revisit notes.

165. Among the marketers to whom Muhammad Shahab directed this request were Christopher Collins, Mallory, Shannon, and Jones.

166. Christopher Collins, Mallory, Shannon, and Jones responded to Muhammad Shahab's request by contacting or causing to be contacted the 30 patients and obtaining their signatures on a new set of visit and/or revisit notes.

167. The signed but otherwise blank visit and/or revisit notes were then provided to the therapists associated with the patient and the therapists redid the notes.

168. Muhammad Shahab then submitted the new documentation obtained in this manner to Trust Solutions.

169. In or about July 2009, All American received another letter from Trust Solutions, this time asking for a number of specific categories of documents including the names and addresses of all consultants used by the company and copies of the contracts with those consultants.

170. As a result of the July 2009 request from Trust Solutions, Muhammad Shahab requested and reviewed a list of all persons or entities to whom All American had made payments.

171. At that time, Muhammad Shahab stated to Relator Collins that contracts would need to be created, back-dated, and affixed with signatures for all of the marketers and purported consultants to which All American had made payments.

172. Muhammad Shahab stated to Relator Collins that the creation of such agreements was necessary in order to enable All American to "get through" the audit and/or inquiries by Trust Solutions.

173. Muhammad Shahab told Relator Collins that if Relator Collins would help him to "get through" the audit and/or inquiries by Trust Solutions and if Relator Collins would obtain a power of attorney from Christopher Collins and work with Shahab to move Christopher Collins out of All American, Shahab would give Relator Collins a 25 percent ownership share in a new home health care company Shahab would set up.

174. Muhammad Shahab created such falsified agreements for his companies, AAA Marketer, MARS Management, and OMC. Shahab dated said documents June 30, 2008, July 10, 2008, and January, 30, 2009, respectively, and he affixed the signature of Hassan Akhtar to the agreements on behalf of All American.

175. Muhammad Shahab created similar falsified agreements for the other companies and took the signature pages with him. Muhammad Shahab later returned one of those pages to Relator Collins with signatures.

176. Relator Collins did not submit the fraudulent agreements created by Muhammad Shahab to Trust Solutions.

**Cover Up: "Recycling" of Patients**

177. Upon completion of a 60-day episode of care, a patient is either discharged or identified as needing to be "recertified" for a new episode of care.

178. The Corporate HHA Defendants and Individual HHA Defendants regularly compile a "recert" or "discharge" list, which is shared with other companies within Muhammad Shahad's network.

179. This "recert" or "discharge" list is used by the Corporate HHA Defendants and Individual HHA Defendants as a source of in-network referrals.

180. This "recert" or "discharge" list is compiled and shared at the request and direction of Muhammad Shahad.

181. The Corporate HHA Defendants referred patients amongst themselves in order to reduce suspicion that may come from a patient having multiple continuous treatment episodes at one HHA facility and to increase revenue by increasing the amount of Medicare reimbursement.

182. By way of example, from on or about July 1, 2008 through on or about February 28, 2009 when Hassan Akhtar was, among other things, the Administrator at All American, Akhtar would almost daily send the discharge list directly to Muhammad Shahad via a runner.

183. On numerous occasions, Muhammad Shahad has delivered or caused to be delivered to All American and the other Corporate HHA Defendants a list of "new" patients that they are to enroll along with documents and materials to be used for those patients.

184. In or about August 2009, the Administrator of Embrace entered the offices of All American and stated that Muhammad Shahad had told him to come there and get All American's discharge list because Embrace's patient numbers were down.

185. In addition, on numerous occasions Muhammad Shahab has delivered or caused to be delivered to the various Corporate HHA Defendants opening packages containing a Patient Referral/Intake Form already signed by a physician and OASIS forms and/or revisit notes already signed by the patient, but without dates on any of the signatures and without any of the substantive components of those forms having been completed.

186. One illustrative example of this type of conduct is a package received by Relator Collins from Sherri Prescott, an employee of Acure, in or about June 2009, but prior to June 25, 2009. The first page of this packet bore a blue "post-it" note which read as follows:

> John – Shahab said this patient is open in Acure until 6/25 ( I think). Then open @ AAHC.
>
> S.

187. The package consisted of the following:

a. A Patient Referral/Intake Form identifying the patient, specifying several diagnoses, recommending physical therapy, and bearing Dr. Raval's signature. No date was provided with Dr. Raval's signature.

b. A copy of Form 3495P-08 entitled "Physical Therapy Comprehensive Adult Assessment with OASIS Elements" filled in with the patient's name and identifying information and bearing the patient's signature, but without any of the specific evaluative information being completed or a date provided with the patient's signature.

c. A copy of form CMS 10123 entitled Advanced Beneficiary Notice of Medicare Provider Non-Coverage bearing the patient's signature, but otherwise uncompleted and undated.

d. A copy of a form entitled "Beneficiary Request for Transfer From Another Agency" bearing the patient's signature, but otherwise uncompleted and undated.

e. An copy of a form entitled "Admission Consent Form" bearing the patient's signature, but otherwise uncompleted and undated.

f. Eighteen copies of forms entitled "Physical Therapy Revisit Notice" bearing the patient's signature, but otherwise uncompleted and undated.

g. A copy of a Form CMS 485 entitled "Home Health Certification and Plan of Care" completed for the same patient for an episode of care to commence April 19, 2008 and run through June 17, 2008. Patient Choice is the provider identified in Item No. 7 of the form.

188. Relator Madany has provided the Government with documents that show that certain patients were sent directly from Patient Choice to Embrace.

189. These referrals were made between the Corporate HHA Defendants to keep patients willing to participate in the fraud or willing to forgo actual treatment within their revenue stream.

190. The inter-company referrals were also made to create the appearance that the Corporate HHA Defendants were legitimate. The Defendants sought to reduce the number of consecutive visits by a patient at one particular HHA so that there would not be any "red flags" raised by a patient who is allegedly home-bound and receiving treatment, but is not improving. In fact, those patients were not home-bound and were not receiving the required treatment.

**The Harm Suffered by the United States and the Unlawful Profits Received by Defendants**

191. The United States was damaged by Defendants' conduct because the false claims, statements, and records submitted to CMS and/or the RHHI in the names of the Corporate HHA Defendants caused the United States to make tens of millions of dollars of payments to the Corporate HHA Defendants to which they were not entitled.

192. The conduct of each of the Defendants caused, contributed to, enabled, and/or advanced the submission of false claims, statements, and records to CMS and/or the RHHI and the resulting payment of Medicare funds by the United States.

193. All Defendants profited unlawfully from the illegal scheme.

194. Since on or about July 1, 2008, All American has received payments through the Medicare program in excess of $6 million.

195. On information and belief, Acure, Care Plus, Embrace, Golden Age, and Patient Choice have had Medicare billings exceeding those of All American in the six years preceding the filing of this Complaint.

## JURISDICTION AND VENUE

196. This action arises under 31 U.S.C. § 3729 *et seq*., also known as the FCA, and the common law to recover treble damages and civil penalties on behalf of the United States of America arising out of Defendants' violations of the FCA and the Anti-Kickback Statute.

197. Under § 3732 of the FCA, this Court has jurisdiction over actions brought under the FCA and concurrent jurisdiction over state claims arising from the transactions giving rise under the FCA. Furthermore, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

198. This Court has supplemental jurisdiction over all other claims set forth in this Complaint because these claims are so related to the claims arising under the Federal False Claims Act that they form part of the same case or controversy. See 28 U.S.C. § 1367. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process in cases brought under the False Claims Act, and because, *inter alia*, all Defendants have transacted business in this district, engaged in wrongdoing in this district, and have at least minimum contacts with the district. Further, all or nearly all of the Defendants has his, her, or its principal place of business and/or residence in this district.

199. Venue is proper in this district pursuant to § 3732(a) of the Act, which provides that "any action under § 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by § 3729 occurred." The proscribed acts, which are the subject of this action, occurred in the State of Michigan, within this judicial district. At all times material hereto, Defendants regularly conducted substantial business within the State of Michigan, and maintained permanent employees and offices in the State of Michigan, within this judicial district. Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

## PARTIES

**Relators**

200. Relator, Ruqiayah Madany, is a resident of the State of Michigan and a former employee of Defendants Embrace and All American Homecare, Inc. Relator Madany started her employment in November of 2008 and was terminated in May 2009. Relator Madany's job duties consisted of billing data entry, administrative assistance and reception duties. Relator Madany is an original source of the facts and information hereinafter set forth concerning the activities of Defendants, and the facts averred are based upon personal observations and documents in Relator Madany's possession and provided to the United States.

201. Relator, John B. Collins, is a resident of the State of Michigan. Relator has been employed by Defendant All American since December 2008. Relator Collins currently serves as Assistant Administrator and Treasurer of All American. Relator Collins is an original source of the facts and information hereinafter set forth concerning the activities of Defendants, and the facts averred are based upon personal observations and documents in Relator's possession.

**The Individual Home Health Agency (HHA) Defendants**

202. Defendant Muhammad Shahab is a citizen and resident of the State of Michigan. Muhammad Shahab's personal residence is located at 5016 Silverwood Court in West Bloomfield, Michigan. Muhammad Shahab has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Acure Home Care, Inc.;

b. All American Homecare, Inc.;

c. Embrace Home Health Care;

d. Family Alliance Home Healthcare, LLC;

e. Golden Age Home Health Care, Inc.;

f. Patient Choice Home Health Care, Inc.;

g. Unicare Rehabilitation, Inc.;

h. AAA Marketer & Consultant, LLC;

i. MARS Management & Consultant, LLC; and

j. Office Management & Consultant, LLC.

203. Defendant Chiradeep Gupta (also known as Chiradeep Dutta Gupta, Chiradeep Datta Gupta, and Chiradeep Duttagupta) is a resident of the State of Michigan. Gupta has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to

provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. All American Homecare, Inc.;

b. Care Plus Home Health Care, Inc.;

c. Total Care Physical Therapy and Rehabilitation, Inc.;

d. Unicare Rehabilitation, Inc.;

e. Anthem Management and Investment, Inc.;

f. Paramount Consultation and Management, Inc.; and

g. SH Consultants and Staffing Services, Inc.

204. Defendant Taquir Ahmed (also known as Tauqeer Ahmed) is a resident of the State of Michigan. Taquir Ahmed is the brother-in-law of Muhammad Shahab. Taquir Ahmed has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Acure Home Care, Inc.; and

b. Embrace Home Health Care.

205. Defendant Hassan Akhtar is a resident of the State of Michigan. Akhtar has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. All American Homecare, Inc.; and

b. SH Consultants and Staffing Services, Inc.

206. Defendant Nusrat Ali is a resident of the State of Michigan. Ali has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Acure Home Care, Inc.;

b. All American Homecare, Inc.;

c. Embrace Home Health Care; and

d. Patient Choice Home Health Care, Inc.

207. Defendant Naheed Baqi is a resident of the State of Michigan. Baqi is the sister of Muhammad Shahab. Baqi has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. All American Homecare, Inc.

208. Defendant John Cinol is a resident of the State of Michigan. In or about 2008, Cinol owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide

services to companies who do so. Among such companies presently known to Relators are the following:

a. All American Homecare, Inc.;

209. Defendant Christopher Collins is a resident of the State of Michigan. Christopher Collins has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. All American Homecare, Inc.;

b. Patient Choice Home Health Care, Inc.;

c. Community Liaison Solutions, LLC; and

d. Consumers Choice Community Liaison, LLC.

210. Defendant Muhammad Forcon-Alhuk is a resident of the State of Michigan. Forcon-Alhuk has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Unicare Rehabilitation, Inc.; and

b. Office Management & Consultant, LLC.

211. Defendant Mehran Javidan is a resident of the State of Michigan. Mehran Javidan has owned, operated, supervised, exercised control over, worked for, served as an officer

or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Acure Home Care, Inc.

212. Defendant Farah Khan is a resident of the State of Michigan. Khan has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Acure Home Care, Inc.

213. Defendant Muhammad Zahid-Abrar Khan is a resident of the State of Michigan. Zahid-Abrar Khan has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Family Alliance Home Healthcare, LLC; and

b. Golden Age Home Health Care, Inc.

214. Defendant Hassan Mansoor is a resident of the State of Michigan. Mansoor has worked for or with or otherwise exercised control over companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to

provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Office Management & Consultant, LLC.

215. Defendant Vijay Mishra is a resident of the State of Michigan. Mishra has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. All American Homecare, Inc.;

b. Total Care Physical Therapy and Rehabilitation, Inc.;

c. Unicare Rehabilitation, Inc.; and

d. Anthem Management and Investment, Inc.

216. Defendant Rana M. Naeem is a resident of the State of Michigan. Naeem has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. All American Homecare, Inc.

217. Defendant Telish Patel (also known as Tilesh Patel) is a resident of the State of Michigan. Telish Patel has worked with and for various home health care companies operating in the Detroit metropolitan area, including has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to

individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Acure Home Care, Inc.; and

b. Paramount Consultation and Management, Inc.

218. Defendant Sherry Prescott is a resident of the State of Michigan. Prescott has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Acure Home Care, Inc.; and

b. All American Homecare, Inc.

219. Defendant Sree Rval is a resident of the State of Michigan. Rval has worked with and for various home health care companies operating in the Detroit metropolitan area, including has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Care Plus Home Health Care, Inc.;

b. Total Care Physical Therapy and Rehabilitation, Inc.; and

c. Unicare Rehabilitation, Inc.

220. Defendant Rahat Shahab is a resident of the State of Michigan. Rahat Shahab is the wife of Muhammad Shahab. Rahat Shahab has owned, operated, supervised, exercised

control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Embrace Home Health Care; and

b. MARS Management & Consultant, LLC.

221. Defendant Maira Suleman is a resident of the State of Michigan. Suleman has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. All American Homecare, Inc; and

b. Patient Choice Home Health Care, Inc.

222. Defendant John Thomas is a resident of the State of Michigan. Thomas has owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. Acure Home Care, Inc.;

b. All American Homecare, Inc.; and

c. Golden Age Home Health Care, Inc.

223. Defendant Timothy M. Tucker is a resident of the State of Michigan. Tucker has owned, operated, supervised, exercised control over, worked for, served as an officer or director

of, and/or had a financial interest in companies in the Detroit metropolitan area which purport to provide home health care services to individuals covered by Medicare or to provide services to companies who do so. Among such companies presently known to Relators are the following:

a. All American Homecare, Inc.;

b. Care Plus Home Health Care, Inc.; and

c. Patient Choice Home Health Care, Inc.

224. Defendants John and Jane Does 1 through 99 are individuals whose names and/or identities are not presently known to Relators and who have owned, operated, supervised, exercised control over, worked for, served as an officer or director of, and/or had a financial interest in any of the companies named as Defendants in paragraphs 36 through 43 *infra* during the six year period preceding the date of the filing of this Complaint and who have supported, participated in, and/or conspired to commit any of the unlawful activities described herein.

**The Corporate Home Health Agency (HHA) Defendants**

225. Defendant Acure Home Care, Inc. (hereinafter, "Acure") is a corporation existing and organized under the laws of the State of Michigan. Acure has its principal place of business located at 21700 Greenfield Road in Oak Park, Michigan.

226. Defendant All American Homecare, Inc. (hereinafter, "All American") is a corporation existing and organized under the laws of the State of Michigan. All American has its principal place of business located at 21700 Greenfield Road in Oak Park, Michigan.

227. Defendant Care Plus Home Health Care, Inc. (hereinafter, "Care Plus") is a corporation existing and organized under the laws of the State of Michigan. Care Plus has its principal place of business located at 21700 Greenfield Road in Oak Park, Michigan.

228. Defendant Embrace Home Health Care (hereinafter, "Embrace") is a corporation existing and organized under the laws of the State of Michigan. Embrace has its principal place of business located at 21700 Greenfield Road in Oak Park, Michigan.

229. Defendant Family Alliance Home Healthcare, LLC (hereinafter, "Family Alliance") is a limited liability corporation existing and organized under the laws of the State of Michigan. Family Alliance has its principal place of business located at 24001 Southfield Road in Southfield, Michigan.

230. Defendant Golden Age Home Health Care, Inc. (hereinafter, "Golden Age") is a corporation existing and organized under the laws of the State of Michigan. Golden Age has its principal place of business located at 21700 Greenfield Road in Oak Park, Michigan.

231. Defendant Patient Choice Home Health Care, Inc. (hereinafter, "Patient Choice") is a corporation existing and organized under the laws of the State of Michigan. Patient Choice has its principal place of business located at 21700 Greenfield Road in Oak Park, Michigan.

232. Defendants XYZ Companies 1 through 99 are entities whose names and/or identities are not presently known to Relators and which are engaged in the home health care business in the State of Michigan and which are or have been in the six years preceding the filing of this Complaint owned or controlled by or otherwise connected or affiliated with Muhammad Shahab, Chiradeep Gupta, Taquir Ahmed, Hassan Akhtar, Nusrat Ali, Naheed Baqi, John Cinol, Christopher Collins, Muhammad Forcon-Alhuk, Mehran Javidan, Farah Khan, Muhammad Zahid-Abrar Khan, Hassan Mansoor, Vijay Mishra, Rana M. Naeem, Telish Patel, Sherry Prescott, Sree Rval, Rahat Shahab, Maria Suleman, John Thomas, and/or Timothy M. Tucker and who have supported, participated in, and/or conspired to commit any of the unlawful activities described herein.

**The Marketer Defendants**

233. Defendant Laura Barrett is a resident of the State of Michigan. Barrett has identified and recruited patients for the Individual HHA Defendants and/or the Corporate HHA Defendants identified *supra*, including from adult foster care homes in and around Pontiac, Michigan.

234. Defendant Community Liaison Solutions, LLC (hereinafter, "Community Liaison") is a limited liability corporation existing and organized under the laws of the State of Michigan. Community Liaison has its principal place of business located at 645 Griswold in Detroit, Michigan. Christopher Collins is the owner and operator of Community Liaison.

235. Defendant Consumers Choice Community Liaison, LLC (hereinafter, "Consumers Choice") purports to be a limited liability corporation existing and organized under the laws of the State of Michigan. Consumers Choice has its principal place of business located at 2739 South Brandon Street, Michigan. Christopher Collins is the owner and operator of Consumers Choice.

236. Defendant Latricia Dixon is a resident of the State of Michigan. Dixon has identified and recruited patients for the Individual HHA Defendants and/or the Corporate HHA Defendants identified *supra*.

237. Defendant Johnny Henry is a resident of the State of Michigan. Henry has identified and recruited patients for the Individual HHA Defendants and/or the Corporate HHA Defendants identified *supra*.

238. Defendant Myra Jones is a resident of the State of Michigan. Jones has identified and recruited patients and for the Individual HHA Defendants and/or the Corporate HHA

Defendants identified *supra*, including from adult foster care homes in and around Pontiac, Michigan.

239. Defendant Rana Khan is a resident of the State of Michigan. Khan has identified and recruited patients and for the Individual HHA Defendants and/or the Corporate HHA Defendants identified *supra*.

240. Defendant Mallory Marketing LLC is a limited liability corporation existing and organized under the laws of the State of Michigan. Mallory Marketing has its principal place of business located at 21700 Greenfield Road in Oak Park, Michigan.

241. Defendant Curtis Mallory is a resident of the State of Michigan. Mallory is the owner and operator of Mallory Marketing. Mallory has identified and recruited patients and for the Individual HHA Defendants and/or the Corporate HHA Defendants identified *supra*.

242. Defendant Greg Poole is a resident of the State of Michigan. Poole has identified and recruited patients and for the Individual HHA Defendants and/or the Corporate HHA Defendants identified *supra*, including working specifically with and for Mallory Marketing and/or Curtis Mallory.

243. Defendant Guy Ross is a resident of the State of Michigan. Ross has identified and recruited patients and for the Individual HHA Defendants and/or the Corporate HHA Defendants identified *supra*.

244. Defendant Shannon Community Liaison, LLC is a limited liability corporation existing and organized under the laws of the State of Michigan. Shannon Community Liaison has its principal place of business located at 16500 North Park Drive in Southfield, Michigan.

245. Defendant Richard Shannon is a resident of the State of Michigan. Shannon is the owner and operator of Shannon Community Liaison. Shannon has identified and recruited

patients and for the Individual HHA Defendants and/or the Corporate HHA Defendants identified *supra*.

246. Defendants ABC Marketing Companies 1 through 99 are entities whose names and/or identities are not presently known to Relators and who have solicited, recruited, and/or otherwise communicated with potential Medicare-eligible patients for or on behalf of one or more of the Corporate HHA Defendants or any individual associated or affiliated with any of the Corporate HHA Defendants within the six years prior to the filing of this Complaint.

247. Defendants John and Jane Marketers 1 through 99 are individuals whose names and/or identities are not presently known to Relators and who have solicited, recruited, and/or otherwise communicated with potential Medicare-eligible patients for or on behalf of one or more of the Corporate HHA Defendants or any individual associated or affiliated with any of the Corporate HHA Defendants within the six years prior to the filing of this Complaint.

**The Physician Defendants**

248. Defendant Home Visiting Group, Inc. is a corporation existing and organized under the laws of the State of Michigan. Home Visiting Group's principal place of business is located at 21700 Greenfield Road in Oak Park, Michigan.

249. Defendant Friedrich Dutka, M.D., is a resident of the State of Michigan. Dr. Dutka has held himself out as a physician. Dr. Dutka is associated or affiliated with Home Visiting Group.

250. Defendant Mohammed Elffillah is a resident of the State of Michigan. Elffillah has held himself out as a physician, specifically as Dr. Rohane Patel.

251. Defendant Rohane Patel, M.D., is a resident of the State of Michigan. Dr. Patel has held himself out as a physician.

252. Defendant Paul Petre, M.D., is a resident of the State of Michigan. Dr. Petre has held himself out as a physician and is the owner and operator of Home Clinic P.C. and Home Clinic Group P.C. Prior to starting those companies, Dr. Petre was a partner in Southwest Visiting Physicians located at 28800 Ryan Road in Warren, Michigan.

253. Defendant Home Clinic P.C. is a professional corporation existing and organized under the laws of the State of Michigan. Home Clinic's principal place of business is located at 23999 Northwestern Highway in Southfield, Michigan. Home Clinic is owned and operated by Dr. Petre.

254. Defendant Home Clinic Group P.C. is a professional corporation existing and organized under the laws of the State of Michigan. Home Clinic Group's principal place of business is located at 23999 Northwestern Highway in Southfield, Michigan. Home Clinic Group is owned and operated by Dr. Petre.

255. Defendant Pramod Raval, M.D., is a resident of the State of Michigan. Dr. Raval has held himself out as a physician. Dr. Raval operates several medical clinics in and around the Detroit area.

256. Defendant Victor Savinov, M.D., is a resident of the State of Michigan. Dr. Savinov has held himself out as a physician. His offices are located at 21700 Greenfield Road in Oak Park, Michigan.

257. Defendants John and Jane Doctors 1 through 99 are individuals who have held themselves out as physicians, clinics, and/or other providers of physician services whose names and/or identities are not presently known to Relators and who have signed or allowed their name to be signed to "Patient Referral/Intake Forms" or other documents indicating that a patient is homebound and/or requires home health care services in connection with the activities of any of

the Corporate HHA Defendants and (a) has done so without having first examined said patient, (b) has done so with knowledge that such services were not medically necessary, and/or (c) has done so in exchange for remuneration.

**The Therapist Defendants**

258. Defendant Total Care Physical Therapy and Rehabilitation, Inc. (hereinafter, "Total Care") is a corporation existing and organized under the laws of the State of Michigan. Total Care has its principal place of business located at 17950 Woodward Avenue in Detroit, Michigan.

259. Defendant Unicare Rehabilitation, Inc. (hereinafter, "Unicare Rehab") is a corporation existing and organized under the laws of the State of Michigan. Unicare Rehab has its principal place of business located at 21700 Greenfield Road in Oak Park, Michigan.

260. Defendants DEF Therapist Staffing Companies 1 through 99 are entities whose names and/or identities are not presently known to Relators and which have, for or on behalf of any of the Corporate HHA Defendants and/or any of the patients for which the Corporate HHA Defendants have submitted claims to Medicare, provided or arranged for and/or agreed to provide or arrange for any services or performance by persons who are or who purport to be physical therapists or physical therapist assistants.

261. Defendant Thirupathireddy Allala is a resident of the State of Michigan. Allala is a physical therapist who has worked with and for the Corporate HHA Defendants and/or the Individual HHA Defendants.

262. Defendant Ejaz Chaudry is a resident of the State of Michigan. Ejaz Chaudry is a physical therapist who has worked with and for the Corporate HHA Defendants and/or the Individual HHA Defendants.

263. Defendant Faisal Chaudry is a resident of the State of Michigan. Faisal Chaudry is a physical therapist assistant who has worked with and for the Corporate HHA Defendants and/or the Individual HHA Defendants.

264. Defendant Tariq Chaudry is a resident of the State of Michigan. Tariq Chaudry is a physical therapist assistant who has worked with and for the Corporate HHA Defendants and/or the Individual HHA Defendants.

265. Defendant Dathatrya Kandgari is a resident of the State of Michigan. Kandgari is a physical therapist who has worked with and for Total Care and/or Unicare Rehab.

266. Defendant Robert Lage is a resident of the State of Michigan. Lage is a physical therapist assistant who has worked with and for the Corporate HHA Defendants and/or the Individual HHA Defendants.

267. Defendant Naga Maddali is a resident of the State of Michigan. Maddali is a physical therapist who has worked with and for the Corporate HHA Defendants and/or the Individual HHA Defendants.

268. Defendant Vishnupradeep Meda is a resident of the State of Michigan. Meda is a physical therapist who has worked with and for the Corporate HHA Defendants and/or the Individual HHA Defendants.

269. Defendant Vipin Reddy Muppidi is a resident of the State of Michigan. Muppidi is a physical therapist who has worked with and for the Corporate HHA Defendants and/or the Individual HHA Defendants.

270. Defendant Chintu Phillip is a resident of the State of Michigan. Phillip is a physical therapist who has worked with and for the Corporate HHA Defendants and/or the Individual HHA Defendants.

271. Defendant Joseph M. Pious is a resident of the State of Michigan. Pious is a physical therapist who has worked with and for Total Care and/or Unicare Rehab.

272. Defendant Chamala Pratyush is a resident of the State of Michigan. Pratyush is a physical therapist who has worked with and for Total Care and/or Unicare Rehab.

273. Defendant Ramnaresh Rajulapati is a resident of the State of Michigan. Rajulapati is a physical therapist who has worked with and for Total Care and/or Unicare Rehab.

274. Defendant Abbas Shah is a resident of the State of Michigan. Shah is a physical therapist assistant who has worked with and for the Corporate HHA Defendants and/or the Individual HHA Defendants.

275. Defendant Seelam Srinivasu is a resident of the State of Michigan. Srinivasu is a physical therapist who has worked with and for Total Care and/or Unicare Rehab.

276. Defendant Jessica Virgil is a resident of the State of Michigan. Virgil is a physical therapist who has worked with and for the Corporate HHA Defendants and/or the Individual HHA Defendants.

277. Defendant Paresh Vyus is a resident of the State of Michigan. Vyus is a physical therapist who has worked with and for Total Care and/or Unicare Rehab.

278. Defendants John and Jane Therapists 1 through 99 are individuals whose names and/or identities are not presently known to Relators and who hold themselves out as physical therapists or physical therapist assistants and who have supported, participated in, and/or conspired to commit any of the unlawful activities described *infra* in connection with Total Care, Unicare Rehab, or any of the Corporate HHA Defendants.

**The Patient Defendants**

279. Defendants John and Jane Patients 1 through 20,000 are individuals whose names and/or identities are protected from public disclosure in this Complaint or are not presently known to Relators and who knowingly agreed to accept monetary payments or any other thing of value in exchange for being or allowing themselves to be claimed as patients of any of the Corporate HHA Defendants and/or who agreed to sign undated or future-dated documentation relating to home health care services purportedly to be provided by any of the Corporate HHA Defendants or their employees, agents, or contractors. Relators are aware of the names and/or identities of many of these patients, but have not listed them in the Complaint for the purpose of confidentiality.

**The Consultant Defendants**

280. Defendant AAA Marketer & Consultant, LLC (hereinafter, "AAA Marketer") is a limited liability corporation existing and organized under the laws of the State of Michigan. AAA Marketer has its principal place of business located at 5016 Silverwood Court in West Bloomfield, Michigan—the same address as Muhammad Shahab's personal residence.

281. Defendant Anthem Management and Investment, Inc. (hereinafter, "Anthem") is a corporation existing and organized under the laws of the State of Michigan. Anthem has its principal place of business located at 2952 Sylvan Drive in Sterling Heights, Michigan.

282. Defendant MARS Management & Consultant, LLC (hereinafter, "MARS Management") is a limited liability corporation existing and organized under the laws of the State of Michigan. MARS Management has its principal place of business located at 5016 Silverwood Court in West Bloomfield, Michigan—the same address as Muhammad Shahab's personal residence.

283. Defendant Office Management & Consultant, LLC (hereinafter, "OMC") is a limited liability corporation existing and organized under the laws of the State of Michigan. OMC has its principal place of business located at 21700 Greenfield Road in Oak Park, Michigan.

284. Defendant Paramount Consultation and Management, Inc. (hereinafter, "Paramount Consultation") is a corporation existing and organized under the laws of the State of Michigan. Paramount Consultation has its principal place of business located at 1608 Ashmun Street in Sault Sainte Marie, Michigan.

285. Defendant SH Consultants and Staffing Services, Inc. (hereinafter, "SH Consultants") is a corporation existing and organized under the laws of the State of Michigan. SH Consultants has its principal place of business located at 33040 Karin Drive in Sterling Heights, Michigan.

286. Defendants GHI Companies 1 through 99 are entities whose names and/or identities are not presently known to Relators and which are owned, operated, and/or affiliated or associated with any of the Individual HHA Defendants and to which monetary payments or any other thing of value has been provided by any of the Corporate HHA Defendants in the six years preceding the filing of this Complaint.

*****

287. At all relevant times each of the Defendants identified above acted by and through their several officers, employees, and agents and are therefore vicariously liable for the acts and omissions of their several officers, employees and agents by application of the doctrine of respondeat superior.

288. The acts and omissions complained of that constitute violations of federal and state law were, on information and belief, part of a wider scheme involving other time periods and other persons and entities. Relators will seek leave to amend this complaint to join and/or specifically name additional parties as may become appropriate.

**REGULATORY FRAMEWORK**

289. Relators bring this *qui tam* action in the name of the United States of America against the Defendants, jointly and severally. This is an action pursuant to the False Claims Act, 31 U.S.C. §3729 *et seq*. ("FCA") to recover damages and civil penalties for false statements and claims that defendants made or presented to the United States. The violations arise out of Defendants' requests for payment by Medicare and to federal health care programs based on false claims for home health services. The false claims arise out of violation of self-referral prohibitions and anti-kickback laws, as more fully set forth below.

290. By falsely billing, as set forth in this Complaint, the defendants knowingly caused the U. S. to pay defendants more than it would have had defendants followed the proper billing procedures.

291. Relators bring this action for violations of the FCA on behalf of themselves and the United States of America pursuant to 31 U.S.C. § 3730(b)(1).

292. The federal False Claims Act provides that those who knowingly and willfully make or cause to be made any false statement or representation of a material fact in any application for any benefit or payment from the federal government is liable for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the federal government sustains because of those acts. 31 U.S.C. § 3729(a).

293. The Medicare Program is a health insurance program for individuals 65 years and

older, certain disabled individuals under age 65, and people of any age who have permanent kidney failure. The Medicare statute is codified at 42 U.S.C. § 1395 (Title XVIII of Social Security Act, 42 U.S.C. § 483.1 *et seq*.).

294. Medicare is funded by the federal government and administered by the Centers for Medicare and Medicaid Services ("CMS")—formerly known as the Health Care Financing Administration (HCFA)—of the United States Department of Health and Human Services (HHS).

**Anti-Kickback Statute and Stark Law**

295. In 1972, Congress enacted the federal health care Anti-Kickback Statute, 42 U.S.C. § 1320a-7b *et seq*., which prohibited payments, directly or indirectly designed to induce a person to refer or recommend services that may be paid for by federal government.

296. The federal health care Anti-Kickback Statute provides that those who knowingly and willfully solicit or receive, offer or pay receive anything of value, whether directly or indirectly, in exchange for or to induce the referral of items or services for which a federal health care program may make payment shall be guilty of a felony. 42 U.S.C. § 1320a-7b(b)(1).

297. In 1989, Congress granted CMS the power to enforce prohibitions on physicians referring Medicare patients for designated health services to entities in which those physicians have a financial interest. Those prohibitions are codified in 42 U.S.C. §1395nn and are often referred to as the "Stark Law," after U.S. Representative Pete Stark, who introduced the legislation.

298. The Stark Law prohibits HHAs and certain other entities from submitting Medicare claims for payment for items and services that are the product of patient referrals from physicians having an impermissible "financial relationship" with the HHA. Specifically, the Stark Law provides that

> Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then--
>
> > (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
> >
> > (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

299. The Stark Law broadly defines prohibited financial relationships to include both any ownership or investment interest in either the HHA to which the referral is made or the entity providing the designated health services and any "compensation arrangement" between the physician and the HHA. 42 U.S.C. § 1395nn(a)(2).

**Home Health Agency Care Requirements**

300. Medicare consists of four primary parts generally referred to as Parts A, B, C, and D. Part A, Hospital Insurance (HI), covers the cost of inpatient hospital stays, brief stays in skilled nursing facilities (SNF), hospice care, and, in certain circumstances, home health care. Part A is provided free of premiums to most eligible people, but certain otherwise ineligible people may voluntarily pay a monthly premium for coverage.

301. Part B, Supplementary Medical Insurance (SMI), helps pay for some services and products not covered by Part A, generally on an outpatient basis. Part B covers physician and nursing services, outpatient treatments and procedures, x-rays, laboratory and diagnostic tests, and other services and products, including home health care. Part B is optional and all eligible

people must pay a monthly premium in order to be covered.[2] For low income persons in certain states, Medicaid will pay their Part B premium.

302. Home health agency (HHA) care is covered by both Parts A and B of Medicare.[3] 42 U.S.C. §§ 1395d(a)(3), 1395k(a)(2)(A). The services covered under this benefit include part-time or intermittent skilled nursing care, speech-language pathology, physical and occupational therapy, part-time or intermittent home health aide services, and medical social services which must be provided to the patient on a visiting basis, in his or her place of residence. *See* 42 U.S.C. § 1395x(m).

303. In order for HHA care to be reimbursable under Medicare, a physician must first certify a patient's need for home health services, including that the patient is confined to the home (except when receiving certain services) and needs nursing care or therapy. 42 U.S.C. §§ 1395f(a)(2)(C), 1395n(a)(2)(A); 42 C.F.R. § 424.22.

304. Under Medicare, no payment may be made for home health services that are not reasonable and necessary for the prevention of an illness. 42 U.S.C.A. §1395(y)(1)(B).

305. Generally, a patient's treating physician will direct the provision of home health services by completing and signing an order or referral indicating that the patient is homebound and specifying which particular discipline(s) of home health services are needed (*e.g.*, skilled nursing care, physical therapy, occupational therapy, *etc.*).

---

[2] In recent years, two additional parts have been added to Medicare. The Medicare Advantage program, referred to as Part C, was established in 1997 to expand beneficiaries' options for participation in private-sector health care plans. In 2003, a fourth part of Medicare, known as Part D, was added to help pay for prescription drugs not otherwise covered by Part A or Part B.

[3] The Balanced Budget Act of 1997, Public Law 105-33, transferred from Part A to Part B those home health services furnished on or after January 1, 1998 that are unassociated with a stay in a hospital or an SNF. Part A will continue to cover the first 100 visits following a 3-day hospital stay or a SNF stay; Part B covers any visits thereafter.

306. A plan of care for the patient is established by the physician with the participation of the therapist and other HHA personnel. The plan of care must be reviewed and signed by the physician at least once every 60 days. 42 C.F.R. §§ 409.41(b), 409.42, 409.43, 484.18(a)-(b).

307. The home health services must then be provided over the course of a series of visits to the patient's home by the registered nurse or the qualified therapist (or appropriate nursing personnel or qualified therapy assistants under the supervision of the registered nurse or qualified therapist). *See* 42 C.F.R. § 484.30, 484.32.

308. Federal statutes and regulations set various conditions for an HHA's participation in the Medicare program. Among these conditions and requirements are the following:

a. The HHA and its staff must operate and furnish services in compliance with all applicable Federal, State, and local laws and regulations. 42 U.S.C. § 1395bbb(a)(5); 42 C.F.R. § 484.12(a).

b. The HHA must disclose certain information about its ownership and management "at the time of [its] initial request for certification, for each survey, and at the time of any change in ownership or management." 42 C.F.R. § 484.12(b).

c. Administrative and supervisory functions cannot be delegated to another agency or organization. All services that are not furnished directly by the HHA must be "monitored and controlled" by the HHA. 42 C.F.R. § 484.14.

d. An HHA must offer part-time or intermittent skilled nursing services and at least one other therapeutic service (*i.e.*, physical, speech, or occupational therapy; medical social services; or home health aide services). At least one of the qualifying services must be

provided directly through the HHA's own employees as opposed to under arrangements with other agencies or organizations. 42 C.F.R. § 484.14(a).

e. All services must be furnished under the supervision and direction of a physician or a registered nurse and such supervising person must be available at all times during operating hours and must participate in all activities relevant to the services furnished. 42 C.F.R. § 484.14(d).

f. If services are to be provided under arrangements with other agencies or organizations rather than by the HHA's own employees, those services must be subject to a written contract which specifies, *inter alia*, the services to be furnished, the procedures for payment, and the manner in which the services will be controlled, coordinated, and evaluated by the primary HAA. 42 C.F.R. § 484.14(f) & (h).

g. A written summary report for each patient must be sent to the attending physician at least once every 60 days. 42 C.F.R. § 484.14(g).

h. The HHA must establish a "group of professional personnel" (at least one member of which must be a physician or registered nurse and at least one member of which must be neither an owner nor an employee of the HHA) which must conduct an annual review of the HHA's policies, practices, and performance and must "meet[] frequently" to advise and evaluation the function of the HHA. 42 C.F.R. § 484.16; *see also* 42 C.F.R. § 484.52.

309. CMS contracts with regional home health intermediaries (RHHIs) to assist in the administration of home health cost report auditing and claims processing and payment. 42 U.S.C. § 1395h(e)(4). RHHIs contract to serve as the fiscal agent between providers and the federal government and apply Medicare coverage rules to determine the appropriateness of claims and pay them accordingly.

310. HHA care provided under a home health plan of care (whether under Part A or Part B) usually does not require the beneficiary to make any deductible or coinsurance payment.

311. Beneficiaries may, however, be required to make a deductible or coinsurance payment for Part B HHA care not covered under a plan of care. It is the responsibility of the HHA to determine and collect the amount of any unmet deductible from the patient.

312. Since October 1, 2000, payments for HHA care under both Part A and Part B are made under a prospective payment system (PPS). *See* 42 U.S.C. § 1395fff; 42 C.F.R. §§ 484.200 *et seq.* A PPS is a system in which the health care provider receives a standardized, predetermined amount of money for each episode of care provided to the patient.

313. The unit of payment under the home health PPS (HH PPS) is a 60-day episode of care. *See* 42 C.F.R. § 484.205(a).

314. The HHA PPS establishes a national prospective 60-day episode payment which is intended to reflect payment in full for the provision of home health care services for a given episode of care. *See* 42 C.F.R. § 484.205(b). This prospective 60-day episode payment rate is based upon data compiled by CMS regarding the reasonable costs of home health services. *See* 42 C.F.R. §§ 484.210-225.

315. The national prospective 60-day episode payment is subject to adjustment based upon the health condition and care needs of the beneficiary and the geographic differences in wages for HHAs across the country. 42 U.S.C. §§ 1395bbb(g), 1395fff(b).

316. The 60-day episode payment for a given patient is determined at the beginning of the episode of care based upon an assessment of that patient's condition and likely needs. A nurse or therapist from the HHA uses the Outcome and Assessment Information Set (OASIS) instrument to assess the patient's condition. OASIS items describing the patient's condition, as

well as the expected therapy needs (physical, speech-language pathology, or occupational) are used to determine what adjustments to the standard payment rate are appropriate. This adjustment is called the "case-mix adjustment." Eighty case-mix groups, or Home Health Resource Groups (HHRG), are available for patient classification. The OASIS assessment must be done for each subsequent episode of care a patient receives.

317. An HHA receives two payments from Medicare for each 60-day episode of care. Once the OASIS assessment has been completed, the physician has ordered home care, a plan of care has been established, and the first service visit under the plan has been completed, the HHA may submit a Request for Anticipated Payment (RAP) to its RHHI requesting that it be paid a percentage of the full case-mix and wage adjusted 60-day episode rate up front. Upon the conclusion of the episode of care, the HHA then submits a claim to receive payment of the residual amount. 42 C.F.R. § 484.205(b).

318. The second payment may be adjusted downward if CMS determines at the end of the episode of care that the HHA ultimately furnished minimal services to the patient (referred to as a low-utilization payment adjustment, or "LUPA") or if an intervening event warrants only a partial episode payment. *See* 42 C.F.R. § 484.205(a), (c)-(d).

319. For a patient's initial 60-day episode of care with an HHA, the payment is split with 60 percent coming up front upon submission of an RAP and 40 percent coming at the conclusion of the episode of care upon submission of a claim. 42 C.F.R. § 484.205(b)(1).

320. However, for a second or subsequent 60-day episode of care the payment is split on a 50 percent basis with half coming up front and half coming at the conclusion of the episode of care. 42 C.F.R. § 484.205(b)(2).

321. If a beneficiary is still eligible for care after the end of the first episode, a second episode can begin. There are no limits to the number of episodes a beneficiary who remains eligible for the home health benefit can receive.

322. Under PPS, HHAs must submit patient-specific forms (or the electronic equivalent pursuant to an Electronic Data Interchange Enrollment Form) to the RHHI identifying the referring physician, the date of the services, and a description of the services. During the time periods relevant to this Complaint, both RAPs and claims were submitted using the UB-92 Form (also referred to as Form "HCFA-1450") or, for submissions made on or after May 23, 2007, the UB-04 Form (also referred to as Form "CMS-1450"), or their electronic equivalents.

323. The UB-92 Form provides that the signatures on the face thereof incorporate a number of certifications or verifications, including that "[t]his claim, to the best of my knowledge, is correct and complete …."

324. On the back of the UB-92 Form appears the following:

> **NOTICE: ANYONE WHO MISREPRESENTS OR FALSIFIES ESSENTIAL INFORMATION REQUESTED BY THIS FORM MAY UPON CONVICTION BE SUBJECT TO FINE AND IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW.**

325. The UB-04 Form provides as follows:

> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

326. On the back of the UB-04 Form appears the following:

> **UB-04 NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).**

327. By executing the Electronic Data Interchange Enrollment Form, a provider agrees, *inter alia*,

> 7. That it will submit claims that are accurate, complete, and truthful;
>
> * * *
>
> 10. That the CMS-assigned unique identifier number (submitter identifier) or NPI constitutes the provider's legal electronic signature and constitutes an assurance by the provider that services were performed as billed;
>
> * * *
>
> 12. That it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to fine and/or imprisonment under applicable Federal law;
>
> * * *
>
> 14. That it will research and correct claim discrepancies.

328. A representative of an HHA must sign the Electronic Data Interchange Enrollment Form beneath the following statement: "I am authorized to sign this document on behalf of the indicated party and I have read and agree to the foregoing provisions and acknowledge same by signing below."

329. At the end of their fiscal year, providers must submit a detailed cost report setting forth the total cost of providing Medicare services, including the agency's administrative expenses, less the total interim payments made to the HHA as a result of the forms or electronic submissions during the fiscal year. 42 C.F.R. §§ 413.20(b), 413.24(f); *see generally* 42 C.F.R. §§ 405.1801(b)(1), 413.1 *et seq.*, 484.200 *et seq.*

330. Cost reports must be submitted in a standardized electronic format. 42 C.F.R. § 413.24(f)(4). In addition, the HHA must submit a hard copy of a settlement summary, a statement of certain worksheet totals found within the electronic file, and a statement signed by its administrator or chief financial officer certifying the accuracy of the cost report. The required certification reads as follows:

> I hereby certify that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet Statement of Revenue and Expenses prepared by _____ (Provider Name(s) and Number(s)) for the cost reporting period beginning ___ and ending ___ and that to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

42 C.F.R. § 413.24(f)(4)(iv).

331. Medicare, through its fiscal intermediaries, has the right to audit the home health agency cost reports and financial representations made by the agencies to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to home health agency cost reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

332. At all times, including when they submit year-end cost reports, Medicare providers have a standing obligation to disclose matters affecting their initial or continued right to Medicare payments and are prohibited from concealing such matters in order to retain payments to which they were not entitled. 42 U.S.C. § 1320a-7b(a)(3).

333. As a condition of participation in the Medicare program and as a condition precedent to the receipt of payment or reimbursement from Medicare of costs incurred for treating and

providing care to Medicare beneficiaries, Defendants completed cost reports that contained certifications by HHA Defendants that they were familiar with the laws and regulations regarding the provision of healthcare services, and that the services identified in the cost reports were provided in compliance with Medicare laws and regulations.

334. Based on Medicare regulations and laws cited herein, if costs or expenses are billed to Medicare through the submission of false cost reports, then the cost reports are false claims to Medicare because they are based on fraudulent activities and billings of Defendants.

335. The Defendants knowingly and intentionally planned and initiated the above-described scheme to circumvent and violate healthcare fraud and obtain and/or inflate payments from the U.S. that the U.S., but for the false statements, would not have paid. This fraudulent maximization of federal reimbursement resulted in higher income, salary, bonuses and other payments to each Defendant. The above-listed knowing and/or reckless violations of the Stark Law, anti-kickback acts and home health requirements rendered Defendants out of compliance with Medicare and ineligible to receive Medicare reimbursements for services.

336. Accordingly, all reimbursement claims submitted to Medicare were improper and fraudulent.

## COUNT I
## Conspiracy to Violate the False Claims Act – 31 U.S.C. § 3729(a)(1)(C)
## (All Defendants)

337. Relators repeat and reallege paragraphs 1 through 336 above as if fully set forth herein.

338. Beginning in or about 2006 and continuing through the date of this Complaint, all Defendants willfully conspired to:

a. knowingly present, or cause to be presented, false or fraudulent Medicare home health services claims for payment or approval by the United States;

b. knowingly make, use, or cause to be made or used, false records or statements material to false or fraudulent Medicare home health services claims;

c. knowingly make, use, or cause to be made or used, false records or statements material to an obligation to pay or transmit to the United States funds reflecting payments previously made by the United States based upon false or fraudulent Medicare home health services claims; and/or

d. knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit payments to the United States funds reflecting payments previously made by the United States based upon false or fraudulent Medicare home health services claims,

all in violation of 31 U.S.C. § 3729(a)(1).

339. One or more of Defendants performed various over acts in furtherance the conspiracy, including but not limited to the following:

a. Completing UB-92 or UB-04 Forms or their electronic equivalents reflecting home health care services for which the Corporate HHA Defendants were not entitled;

b. Submitting to Medicare and/or an RHHI UB-92 or UB-04 Forms or their electronic equivalents reflecting home health care services for which the Corporate HHA Defendants were not entitled;

c. Making or authorizing monetary payments to patients in exchange for their signing up to receive home health care services from the Corporate HHA Defendants;

d. Making or authorizing monetary payments to patients in exchange for their signing documentation reflecting home health care visits that did not or had not yet taken place;

e. Making or authorizing monetary payments to marketers for identifying and recruiting patients according to a per-patient rate;

f. Creation or submission of documentation reflecting home health care visits that did not or had not yet taken place;

g. Creating or signing documents finding that a patient was homebound and that certain home health care services were needed by the patient without examining said patient;

h. Creating or signing documents finding that a patient was homebound and that certain home health care services were needed by the patient where there was no reasonable medical basis for such a determination;

i. Making or authorizing monetary payments to physicians in exchange for their provision of orders referring patients for home health care services; and

j. Completing or submitting annual cost reports which included figures reflecting claimed costs and expenses which were not incurred, concealed the wrongful or improper nature of the costs and expenses being claimed, and/or related to home health care services which the Corporate HHA Defendants did not in fact provide or for which they were otherwise not entitled to receive payment.

340. By virtue of the conspiracy, the United States suffered damages and therefore is entitled to a civil penalty plus treble damages under the False Claims Act for each violation thereof.

**COUNT II**
**False Claims Act – 31 U.S.C. § 3729(a)(1)(A)**
**Presentation of False or Fraudulent Claims**
**(Corporate HHA Defendants and Individual HHA Defendants)**

341. Relators repeat and reallege paragraphs 1 through 336 above as if fully set forth herein.

342. Defendants knowingly presented, or caused to be presented, false or fraudulent Medicare home health services claims for payment or approval by the United States.

343. By virtue of the false or fraudulent claims knowingly made or caused to be made by Defendants, the United States suffered damages and therefore is entitled to a civil penalty plus treble damages under the False Claims Act for each violation thereof.

**COUNT III**
**False Claims Act – 31 U.S.C. § 3729(a)(1)(B)**
**Making or Using False Records or Statements Material to False or Fraudulent Claims**
**(Corporate HHA Defendants and Individual HHA Defendants)**

344. Relators repeat and reallege paragraphs 1 through 336 above as if fully set forth herein.

345. Defendants knowingly made, used, or caused to be made or used, false records or statements (*i.e.*, the false certifications and representations made or caused to be made on the Corporate HHA Defendants' UB-04s and UB-92s and their electronic equivalents, on the Corporate HHA Defendants' cost reports, on the Patient Referral/Intake Forms, on the OASIS form, on the plan of care form (CMS Form 485), and on the patient visit and/or revisit forms) material to false or fraudulent Medicare home health services claims.

346. By virtue of the false records or false statements knowingly made or caused to be made by Defendants, the United States suffered damages and therefore is entitled to a civil penalty plus treble damages under the False Claims Act for each violation thereof.

**COUNT IV**
**False Claims Act – 31 U.S.C. § 3729(a)(1)(G)**
**Making or Using False Records or Statements Material to an Obligation to Refund**
**(Corporate HHA Defendants and Individual HHA Defendants)**

347. Relators repeat and reallege paragraphs 1 through 336 above as if fully set forth herein.

348. Defendants knowingly made, used, or caused to be made or used, false records or statements (*i.e.*, the false certifications and representations made or caused to be made on the Corporate HHA Defendants' UB-04s and UB-92s and their electronic equivalents, on the Corporate HHA Defendants' cost reports, on the Patient Referral/Intake Forms, on the OASIS form, on the plan of care form, and on the patient visit and/or revisit forms) material to an obligation to pay or transmit to the United States funds reflecting payments previously made by the United States based upon false or fraudulent Medicare home health services claim.

349. By virtue of the false records or false statements knowingly made or caused to be made by Defendants, the United States suffered damages and therefore is entitled to a civil penalty plus treble damages under the False Claims Act for each violation thereof.

**COUNT V**
**False Claims Act – 31 U.S.C. § 3729(a)(1)(G)**
**Concealing, Avoiding, or Decreasing an Obligation to Refund**
**(Corporate HHA Defendants and Individual HHA Defendants)**

350. Relators repeat and reallege paragraphs 1 through 336 above as if fully set forth herein.

351. Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit to the United States funds reflecting payments previously made by the United States based upon false or fraudulent Medicare home health services claim.

352. By virtue of the false records or false statements knowingly made or caused to be made by Defendants, the United States suffered damages and therefore is entitled to a civil penalty plus treble damages under the False Claims Act for each violation thereof.

**COUNT VI**
**Unjust Enrichment**
**(All Defendants)**

353. Relators repeat and reallege paragraphs 1 through 336 above as if fully set forth herein.

354. This is an action to recover monies by which Defendants have been unjustly enriched. Due to Defendants' improper practice, the United States paid monies by which Defendants have been unjustly enriched.

355. By reason of its payments, the United States is entitled to damages in an amount to be determined.

**PRAYER FOR RELIEF**

WHEREFORE, Relators respectfully requests that this Court enter judgment against Defendants as follows:

a. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Civil False Claims Act, 31 U.S.C. §3729 *et seq*. provides;

b. That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendant caused to be presented to the United States;

c. That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relators necessarily incurred in bringing and pressing this case;

d. That Relators be awarded the maximum amount allowed pursuant to the False Claims Act;

e. That this Court award such other and further relief as it deems proper.

## DEMAND FOR A JURY TRIAL

Relators demand a jury trial on all claims alleged herein.

Respectfully submitted,

FRANK, HARON, WEINER, and NAVARRO

By: /s/Louis C. Szura
Monica P. Navarro (P52985)
David L. Haron (P14655)
Louis C. Szura (P71764)
Attorneys for Relators
5435 Corporate Drive, Suite 225
Troy, MI 48098
(248) 952-0400
(248) 952-0890 - Facsimile

[CONTINUED ON NEXT PAGE]

Dated: September 18, 2009

*Of Counsel:*

Daniel Marino
Tillman J. Finley
LUQUE GERAGOS MARINO LLP
910 17th Street, NW Suite 800
Washington, DC 20006
Tel. (202) 223-8888
Fax. (202) 223-8677

Mark J. Geragos
GERAGOS & GERAGOS P.C.
644 South Figueroa Street
Los Angeles, CA 90017
Tel. (213) 625-3900
Fax. (213) 625-1600

Marcella Auerbach
Nolan & Auerbach, P.A.
435 North Andrews Ave
Suite 401
Ft Lauderdale, FL 33301
Tel. (954) 779-3943