# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,
*ex rel.* RUQIAYAH MADANY
and JOHN B. COLLINS,

                Plaintiffs,

v.

PAUL M. PETRE MD, et al.,

                Defendants.

_____/

Case No. 2:09-CV-13693

Hon. Paul D. Borman
Mag. Judge Mona K. Majzoub

## GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff United States of America moves for summary judgment pursuant to Federal Rule of Civil Procedure 56, because there are no genuine issues of material fact concerning the five remaining defendants who filed Answers—Dr. Paul Petre, Dr. Victor Savinov, Nabila Mahbub, Chiradeep Gupta, and the Estate of Pramod Raval—and the additional twenty-three defendants against whom the Court entered defaults.

The grounds for this motion are more specifically set forth in the attached brief. Pursuant to Local Rule 7.1(a)(1), the undersigned counsel sought but did not receive concurrence from counsel for the defendants who filed Answers.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s/Brandon C. Helms*
Brandon C. Helms
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan  48226
Phone:  (313) 226.9639
Dated:  March 9, 2018                    Email: Brandon.Helms@usdoj.gov

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,
*ex rel.* RUQIAYAH MADANY
and JOHN B. COLLINS,

                    Plaintiffs,

v.

PAUL M. PETRE MD, et al.,

                    Defendants.

_____/

Case No. 2:09-CV-13693

Hon. Paul D. Borman
Mag. Judge Mona K. Majzoub

## GOVERNMENT'S BRIEF IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

## Issues Presented

1.  Whether the United States is entitled to summary judgment, because there is no genuine issue of material fact that the defendants committed healthcare fraud in violation of the False Claims Act and the Anti-Kickback Statute.

# Table of Contents

I.     INTRODUCTION ................................................................................1

II.    STATEMENT OF MATERIAL FACTS ...........................................2

   A.   Medicare Background ...............................................................2

      1.   Purpose of Medicare .........................................................2

      2.   Home health care ...............................................................3

      3.   Relevant conditions of payment, including compliance with the Anti-Kickback Statute ....................................................4

   B.   Muhammad Shahab's Scheme ..................................................5

   C.   The Defendants ........................................................................9

III.   LEGAL STANDARDS ......................................................................11

IV.    ARGUMENT .....................................................................................12

   A.   The defendants who pled guilty or were convicted by a jury are estopped from challenging their False Claims Act liability .........................13

   B.   All Medicare billings involving Medicare patients churned through Shahab's home healthcare agencies—whether by the agencies, physical therapists, or the certifying physicians—are tainted by kickbacks ..............18

V.     CONCLUSION ..................................................................................25

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

### Cases

*Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*,
　　12 F.3d 1382 (6th Cir. 1993)

*Baxter v. Palmigiano*,
　　425 U.S. 308 (1976)

*Celotex Corp. v. Catrett*,
　　477 U.S. 317 (1986)

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　　475 U.S. 574 (1986)

*United States ex rel. Compton v. Midwest Specialties, Inc.*,
　　142 F.3d 296 (6th Cir. 1998)

*United States ex rel. Kosenske v. Carlisle HMA, Inc.*,
　　554 F.3d 88 (3d Cir. 2009)

*United States ex rel. McNutt v. Haleyville Med. Supps., Inc.*,
　　423 F.3d 1256 (11th Cir. 2005)

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
125 F.3d 899 (5th Cir. 1997)

*United States v. Aleff*,
　　772 F.3d 508 (8th Cir. 2014)

*United States v. Barnette*,
　　10 F.3d 1553 (11th Cir. 1994)

*United States v. Marder*,
　　208 F. Supp. 3d 1296 (S.D. Fla. 2016)

*United States v. McClatchey*,
　　217 F.3d 823 (10th Cir. 2000)

*United States v. Patel*,
        778 F.3d 607 (7th Cir. 2015)

*United States v. Peters*,
        110 F.3d 616 (8th Cir. 1997)

*United States v. Rogan*,
        517 F.3d 449 (7th Cir. 2008)

*United States v. Szilvagyi*,
        398 F. Supp. 2d 842 (E.D. Mich. 2005)


 **Statutes**

31 U.S.C. § 3729(a)(1)(A)

31 U.S.C. § 3729(a)(1)(C)

31 U.S.C. § 3731(e)

42 U.S.C. § 1320c-5

42 U.S.C. § 1395k(a)(2)(A)

42 U.S.C. § 1395d(a)(3)

42 U.S.C. § 1395x(m)


**Other Authorities**

Fed. R. Civ. P. 56

42 C.F.R. § 409.41

42 C.F.R. § 409.42

42 C.F.R. § 424.22

# I.     INTRODUCTION

Defendant Muhammad Shahab established and operated a massive kickback scheme that defrauded the Medicare program of over $20 million between June 1, 2007 and March 5, 2011. All of the other defendants in this *qui tam* action played a role in contributing to that loss, and some caused Medicare to incur additional losses. For example, some assisted Shahab with falsifying records to support Medicare claims; others were paid kickbacks to recruit Medicare beneficiaries for Shahab; physicians were paid kickbacks, or entered into illegal quid pro quo relationships with Shahab's home healthcare agencies, to certify Medicare beneficiaries for home healthcare by his agencies, and to refer beneficiaries to his home healthcare agencies; and physical therapists fraudulently billed Medicare for services they did not perform, and they were paid kickbacks to recruit Medicare beneficiaries for home healthcare.

The majority of the defendants in this case pled guilty in parallel criminal proceedings—or were found guilty by juries in those parallel proceedings—for the very schemes alleged here in the government's amended complaint. For the few who were not prosecuted criminally, there is no genuine issue of material fact that they violated the Anti-Kickback Statute, and therefore violated the False Claims Act. Accordingly, the United States is entitled to summary judgment as a matter of law.

## II.     STATEMENT OF MATERIAL FACTS

### A.     Medicare Background

#### 1.     Purpose of Medicare

The Centers for Medicare and Medicaid Services (CMS) administer the

Medicare program, which is the federal health insurance program for aged and

disabled. *See* https://www.cms.gov/Medicare/Medicare-General-

Information/MedicareGenInfo/index.html (last visited Feb. 26, 2018). Individuals

who receive Medicare benefits are referred to as beneficiaries. *Id.* Medicare has

four primary components (Parts A, B, C and D, *see id.*), but only Parts A and B are

relevant to this case. Part A covers inpatient care in hospitals and some home

health care, and Part B covers doctors' services, outpatient care, and some home

health care. *Id.* (*see also* Ex. 1, Affidavit of Shelly R. Dailey, ¶ 9).

Only individuals and entities—including home health agencies—that have

signed the required certifications concerning compliance with Medicare program

requirements, and are thereafter approved for participation, are assigned billing

numbers and are permitted to bill Parts A and B of Medicare. (Ex. 1, Dailey Aff.,

¶¶ 11–15). These billing numbers are known as "Provider Transaction Access

Numbers," "National Provider Identifiers," "CMS Certification Numbers," or

"OSCAR" numbers. (*Id.* at ¶¶ 13–14). In order to obtain permission to bill

Medicare for home health services, a home health agency must submit accurate information to Medicare on a form called an "855." (*Id.* at ¶ 12).

## 2. Home health care

As part of the Medicare program, the United States pays for certain home health services rendered to Medicare beneficiaries who meet specific coverage requirements. 42 U.S.C. §§ 1395d(a)(3), 1395k(a)(2)(A). The requirements are:

(1) the patient must be confined to the home (or "homebound");[1]

(2) the patient must be under a plan of care timely signed by a physician; and

(3) the patient must have a reasonable need for skilled nursing care or therapy services.

*See* 42 C.F.R. § 424.22; 42 C.F.R. §§ 409.41, 409.42; Medicare Benefit Policy Manual 100-02. Claims for services rendered to patients who do not meet these basic coverage requirements are not to be paid by the Medicare program. *See* 42 C.F.R. § 409.41; Medicare Manual, Chapter 7, Section 20. It is the responsibility of the home health agency providing the services to ensure that it only submits claims for payment for eligible beneficiaries. *See* 42 U.S.C. § 1320c–5; *see also*

---

[1] Medicare defines homebound to mean that the patient (a) because of illness or injury requires assistance (supportive devices such as a cane or walker, use of special transportation, or assistance from another person) in order to leave his residence, or has a condition such that leaving the home is medically contraindicated, and (b) has a normal inability to leave the home, and leaving the home requires a considerable and taxing effort. *See* Medicare Benefit Policy Manual 100-02, Chapter 7, Section 30.1.1.

(Ex. 1, Dailey Aff., ¶¶ 20–23).

To be certified for home health care, an independent certifying physician, together with the home health agency, must establish a plan of care for the patient that is signed by and periodically reviewed by the physician, called a "485." (Ex. 1, Dailey Aff., ¶ 27). *See also* 42 U.S.C. §§ 1395d(a)(3), 1395k(a)(2)(A), 1395x(m), 42 C.F.R. §§ 424.22, 409.41, 409.42. In order for the patient to continue to receive home health benefits in his or her home beyond sixty days, a physician must re-certify that the prerequisite conditions still exist, and must re-certify a plan of care for the patient. (Ex. 1, Dailey Aff., ¶¶ 24–28); *see also* 42 C.F.R. §§ 409.42(3), 424.22(b).

### 3.   Relevant conditions of payment, including compliance with the Anti-Kickback Statute

As noted above, when individuals and entities, including home health agencies, seek to act as Medicare medical providers, they must complete an enrollment form known as an 855. (Ex. 1, Dailey Aff., ¶ 12). When any individual or entity approved to bill Medicare renders a service, it submits a claim for reimbursement that includes its billing number, the identification number for the patient (known as a "HICN"), and a code for the service rendered. (*Id.* at ¶¶ 13–15). Claims submitted to Medicare must be for services that are medically necessary and actually rendered. (*Id.* at ¶ 16).

In addition, all individuals and entities enrolling in Medicare must certify

4

they are aware that any payment to them is conditioned upon their claims being in compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a–7b. (*Id.* at ¶ 19). The main purpose of the Statute is to "protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care, or necessity of services." *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015) (citations omitted). A related purpose is to "protect patients from doctors whose medical judgments might be clouded by improper financial considerations." *Id.*

In relevant part, the Statute prohibits "knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) … in cash or in kind ... in return for referring an individual to a person for the furnishing" of health care services paid for, in whole or in part, by a federal health care program. 42 U.S.C. § 1320a–7b(b)(1). Likewise, the statute prohibits any person or entity from offering or paying any remuneration to induce such referrals of Medicare-related business. § 1320a–7b(b)(2); *see also United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000).

## B.   Muhammad Shahab's Scheme

Muhammad Shahab is the glue that binds all of the other defendants together. Between June 1, 2007 and March 5, 2011, Shahab conspired with roughly two dozen individuals to defraud Medicare.

There were two criminal cases parallel to this *qui tam* action, and they involved the same conduct. In the first indictment, Muhammad Shahab and twelve others were charged with, among other things, committing healthcare fraud conspiracy between August 2007 and September 2009 by (a) submitting fraudulent claims to Medicare; (b) offering and paying kickbacks and bribes to Medicare beneficiaries to file claims for services; (c) soliciting and receiving kickbacks and in return arranging for the furnishing of medical services; (d) concealing the submission of fraudulent claims and the payment of kickbacks; and (e) diverting proceeds of the fraud for personal use. *United States v. Shahab et al.*, Case No. 2:10-cr-20014 (E.D. Mich.) (Ex. 2, Indictment, Dkt. # 3, pp. 1–19). Three superseding indictments added eight more defendants for the same conspiracy and provided additional details regarding the conspiracy. (Ex. 3, First Superseding Indictment, pp. 1–16); (Ex. 4, Second Superseding Indictment, PgID 1058–71); (Ex. 5, Third Superseding Indictment, PgID 1768–76).

The second case involved the same conspiracy, but charged three specific defendants who partially owned, or were employed by, Acure Home Care, Inc. *United States v. Javidan et al.*, No. 2:11-cr-20052 (Ex. 6, Indictment, pp. 1–13). The indictment alleged healthcare fraud conspiracy between March 2009 and November 2010 and focused on kickbacks to Medicare beneficiaries. (*Id.* at 4–6); (*see also* Ex. 7, Superseding Indictment, PgID 168–80).

Shahab pled guilty to conspiracy to commit healthcare fraud for a period that spanned August 2007 through October 2009. (Ex. 8, Shahab Rule 11 Agreement, at 2). He first created Patient Choice Healthcare, Inc. in November 2006, and then established All American Home Care, Inc. in June 2008. (*Id.*). In total, Shahab owned or controlled seven home healthcare agencies: Patient Choice; All American; Embrace Home Health Care; Acure Home Care, Inc.; Golden Age Home Health Care, Inc; Family Alliance Home Healthcare, LLC; and Care Plus Home Health Care, Inc. (Ex. 9, Dep. of M. Shahab dated Aug. 10, 2017, at 7:19–9:11). While operating or being associated with those home healthcare agencies, Shahab and his co-conspirators billed Medicare for home health visits that never occurred, and they created fictitious therapy files to cover their tracks. (*Id.* at 11:7–13); (Ex. 8, Shahab Plea Agreement, at 2–3).

To continue billing Medicare for fraudulent home visits, Shahab and his co-conspirators needed a steady supply of patients, i.e., Medicare beneficiaries, so Shahab and his co-conspirator patient recruiters paid cash kickbacks and other inducements to Medicare beneficiaries in exchange for their signatures indicating they had received therapy services, when they had not. (Ex. 9, Shahab Dep., at 6:13–7:15, 11:17–12:6). (Ex. 8, Plea, at 3). Shahab also paid kickbacks to physicians to ensure that the Medicare beneficiaries were certified and recertified for home healthcare. (Ex. 9, Shahab Dep., at 11:17–25); (Ex. 8, Plea, at 3).

7

In his plea agreement, Shahab agreed that between August 2007 and October 2009, his seven agencies received at least $10,856,130 from Medicare for medical services that were tainted by kickbacks (or were not medically necessary). (Ex. 8, pp. 2–4); (Ex. 9, Shahab Dep., at 13:1–23); (Ex. 10, Shahab Judg., Dkt. # 629, PgID 4037–38). Although Shahab agreed to approximately $10 million for restitution purposes, his agencies actually received over $22 million from Medicare during the life of his conspiracy. (Ex. 11, Declaration of Patricia O'Neill, at ¶ 11).

Rahat Shahab, Muhammad Shahab's wife, ran Embrace Home Health; Muhammad created the agency and had her run it to teach her the business. (Ex. 12, 10-cr-20014, Trial Tr., PgID 5232–33). She oversaw daily operations and was aware that Shahab laundered money through Embrace. (Ex. 13, 10-cr-20052, Trial Tr., PgID 1686–87, 1753–54). Rahat was not prosecuted criminally, but in this *qui tam* action, Plaintiffs and Rahat Shahab entered into a settlement agreement, and Plaintiffs and Muhammad Shahab stipulated to a consent judgment; the Court then dismissed both Muhammad and Rahat Shahab as defendants. (Dkt. ## 317–20).

The First Amended Complaint in this *qui tam* action involves the same conduct and defendants as described above in the criminal actions. (*See generally* First Am. Compl., Dkt. # 186).

### C.   The Defendants

There are five defendants who filed Answers and have not settled their liability: (1) Dr. Paul Petre; (2) Dr. Victor Savinov; (3) Sonal Raval, representing the Estate of Dr. Pramod Raval; (4) Nabila Mahbub; and (5) Chiradeep Gupta, who is pro se. (Dkt. ## 188, 191, 192, 224, & 231).

Nabila Mahbub was the office manager for All American. (Ex. 9, Shahab Dep., at 14:14–15). After a jury found Nabila Mahbub guilty of healthcare fraud conspiracy, the district court ordered restitution of $3,176,470.50. (Ex. 14, Mahbub Judg., PgID 6584, 6588). Mahbub appealed her conviction; the Sixth Circuit remanded for the district court to reconsider a *Batson* challenge she made. *United States v. Mahbub*, 818 F.3d 213, 228 (6th Cir. 2016). On remand, the parties have briefed the *Batson* challenge issue, but the conviction remains in place at this time. (Ex. 44, No. 10-cr-20014, Govt.'s Br. re *Batson*).

Chiradeep Gupta owned a physical therapy company. (Ex. 9, 11:7–13, 14:18–15:3, 34:16–35:8). A jury found Gupta guilty of healthcare fraud and conspiracy to commit healthcare fraud; restitution of $10,164,553.00 was entered against him. (Ex. 15, Gupta Judg., No. 10-cr-20014, Dkt. # 664, PgID 4589).

Regarding Dr. Paul Petre, six of Shahab's seven agencies billed Medicare for patients that Dr. Petre certified for home healthcare and referred to Shahab's agencies. (Ex. 11, O'Neill Aff., at ¶ 13). Medicare paid those six agencies a total

of $1,707,505.51 based on the referrals from Dr. Petre. (*Id.*).

As to Dr. Victor Savinov, all seven of Shahab's agencies billed Medicare for patients that Dr. Savinov certified for home healthcare and referred to Shahab's agencies. (*Id.* at ¶ 13). In total, Medicare paid Shahab's home healthcare agencies $4,055,488.32 for patients referred by Dr. Savinov. (*Id.*).

For the Estate of Pramod Raval, six of Shahab's agencies billed Medicare for patients that Dr. Raval certified and referred. (*Id.* at ¶ 14). In total, Medicare paid $5,665,536.49 for the patients referred by Dr. Raval. (*Id.* at ¶¶ 13 & 14).

Two other defendants, Jessica Vigil and Mohamed El-Fallal, settled through consent judgments. (Dkt. ## 140, 221).

For the remaining twenty-three defendants, the Clerk has entered defaults against them: (1) Acure Home Care, Inc.; (2) Hassan Akhtar; (3) All American Homecare, Inc.; (4) Laura Barrett; (5) Care Plus Home Health Care, Inc.; (6) Tariq Chaudry; (7) Christopher Collins; (8) Embrace Home Health Care; (9) Family Alliance Home Healthcare, LLC; (10) Golden Age Home Health Care, Inc.; (11) Theodore Haile; (12) Mehran Javidan; (13) Mira Jones; (14) Vishnu Pradeep Meda; (15) Curtis Mallory; (16) Patient Choice Home Healthcare, Inc.; (17) Sherry Prescott; (18) Guy Ross; (19) Richard Shannon; (20) Maira Suleman; (21) John Thomas; (22) Total Care Physical Therapy; and (23) Faisal Chaudry. (Dkt. ## 262–83, 285).

## III.     LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Rather, the non-movant must cite particular facts that show a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *see also Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993) (summarizing the general principles the Sixth Circuit follows for evaluating summary judgment).

The False Claims Act holds individuals and companies liable for "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval," or for conspiring to commit such a violation. 37 U.S.C. § 3729(a)(1)(A), and (1)(C). Under the Act, a person "knowingly presents …" information when he or she "(1) has actual knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth …." *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998). Whoever commits a violation is liable to the government for three "times the amount of damages which the Government sustains because of the act of that person." 37 U.S.C. § 3729(a)(1).

11

The Anti-Kickback Statute, in relevant part, prohibits "knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) … in cash or in kind ... in return for referring an individual to a person for the furnishing" of health care services paid for, in whole or in part, by a federal health care program. 42 U.S.C. § 1320a–7b(b)(1). Likewise, the statute prohibits any person or entity from offering or paying any remuneration to induce such referrals of Medicare-related business. § 1320a–7b(b)(2); *see also United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000).

A violation of the Anti-Kickback Statute is a violation of the False Claims Act, because CMS requires compliance with that statute as a condition of payment. *See, e.g.*, *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009); *United States ex rel. McNutt v. Haleyville Med. Supps., Inc.*, 423 F.3d 1256, 1259–60 (11th Cir. 2005); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997).

## IV.    ARGUMENT

For most of the defendants in this case, the Clerk of Court has entered defaults, and the only question for the Court is to determine the appropriate treble damages under the False Claims Act for each such defendant.

Of the five defendants who filed Answers and have not resolved their liability, two of them, Chiradeep Gupta and Nabila Mahbub—or three if the Court

agrees that estoppel applies to the Estate of Pramod Raval—were prosecuted criminally and are estopped from challenging the elements of their False Claims Act violations. The only question for the Court regarding these defendants—as with the defendants against whom the Court entered defaults—is to determine the appropriate treble damages.

As to the last two defendants, Dr. Savinov and Dr. Petre, who were not prosecuted in parallel criminal proceedings—and possibly as to the Estate of Pramod Raval—there remains no genuine issue of material fact that they violated the Anti-Kickback Statute and, by extension, the False Claims Act. Accordingly, the Court should grant summary judgment on all of the government's claims and impose treble damages against the defendants, as required by the False Claims Act.

### A. The defendants who pled guilty or were convicted by a jury are estopped from challenging their False Claims Act liability

Criminal prosecutions have proven that Muhammad Shahab and his co-conspirators were guilty of a massive scheme to defraud Medicare. At least seventeen people have criminal judgments against them. Every such defendant is estopped "from denying the essential elements of the offense" in this action, because it involves "the same transaction as in the criminal proceeding...." 31 U.S.C. § 3731(e). This is true whether the defendant pled guilty or was convicted by a jury. *Id.*; *see also United States v. Szilvagyi*, 398 F. Supp. 2d 842, 845 (E.D. Mich. 2005); *United States v. Aleff*, 772 F.3d 508, 510 (8th Cir. 2014).

13

The defendants in the following table had criminal judgments entered against them in parallel criminal proceedings, and defaults have been entered against them in this case. Given their defaults and the operation of estoppel under the False Claims Act, these defendants are liable for three times the losses suffered by Medicare because of their conduct—see 31 U.S.C. § 3729(a)(1)—which is equal to three times the amount of restitution imposed against them. *See, e.g.*, *United States v. Barnette*, 10 F.3d 1553, 1557–60 (11th Cir. 1994) (noting that criminal restitution is the floor for single damages under the False Claims Act, and the government is entitled to three times the single damages amount, offset by whatever is paid in criminal restitution); *United States v. Rogan*, 517 F.3d 449, 451–53 (7th Cir. 2008) (trebling damages and subtracting amount paid in criminal restitution); *United States v. Peters*, 110 F.3d 616, 617 (8th Cir. 1997) (same).

| Defendant | Amount of Restitution | Criminal Case Record | FCA Liability (3 x Restitution) |
|---|---|---|---|
| Mehran Javidan | $2,215,186.45 | 2:11-cr-20052 (Ex. 16, Judg., PgID 959) | $6,645,559.50 |
| Vishnu Pradeep Meda | $840,550.42 | 2:11-cr-20052 (Ex. 17, Judg., PgID 6481) | $2,521,651.20 |
| Richard Shannon | $1,680,975.00 | 2:10-cr-20014 (Ex. 18, Judg., PgID 6683) | $5,042,925.00 |
| Christopher Collins | $6,967,500.00 | 2:10-cr-20014 (Ex. 19, Plea, pp. 2–4, & Judg., PgID 1045) | $20,902,500.00 |
| Hassan Akhtar | $4,650,000.00 | 2:10-cr-20014 (Ex. 20, Plea, pp. 2–4, & Judg., PgID 4579) | $13,950,000.00 |
| Tariq Chaudhary | $747,282.00 | 2:10-cr-20014 (Ex. 21, Plea, pp. 2–4, & Judg., | $2,241,846.00 |

| Defendant | Amount of Restitution | Criminal Case Record | FCA Liability (3 x Restitution) |
|---|---|---|---|
| | | PgID 4055) | |
| Faisal Chaudray | $917,394.57 | 2:10-cr-20014 (Ex. 22, Plea, pp. 2–4, & Judg., PgID 4049) | $2,752,183.70 |
| Curtis Mallory | $1,618,822.95 | 2:10-cr-20014 (Ex. 23, Plea, PgID 1627–29 & Judg., PgID 4044) | $4,856,468.70 |
| Lura Barrett | $607,000.00 | 2:10-cr-20014 (Ex. 24, Judg., p. 5) | $1,821,000.00 |
| Theodore Haile | $900,000.00 | 2:10-cr-20014 (Ex. 25, Plea, PgID 1645–46, & Judg., PgID 2276) | $2,700,000.00 |
| Myra Jones | $199,194.83 | 2:10-cr-20014 (Ex. 26, Plea, PgID 1548–49, & Judg., PgID 2269) | $597,584.49.00 |
| Sherry Prescott | $3,422,469.00 | 2:10-cr-20014 (Ex. 27, Plea, PgID 1368–69, & Judg., PgID 2681) | $10,267,407.00 |
| Guy Ross | $472,623.58 | 2:10-cr-20014 (Ex. 28, Plea, pp. 2–5, & Judg., PgID 1307) | $1,417,870.70 |
| Maira Suleman | $6,960,000.00 | 2:10-cr-20014 (Ex. 29, Plea, PgID 1667–70, & Judg., PgID 4195) | $20,880,000.00 |
| John Thomas | $987,685.00 | 2:10-cr-20014 (Ex. 30, Plea, PgID 1686–89, & Judg., PgID 6300) | $2,963,055.00 |

In addition to the individual defendants listed above, two of the individual defendants who filed Answers in this case—Chiradeep Gupta and Nabila Mahbub—have prior criminal convictions for healthcare fraud conspiracy for the same conduct as in this case. A jury found Gupta guilty, and the district court entered restitution against him in the amount of $10,164,553.00. (Ex. 31, Gupta

Verdict, PgID 2194); (Ex. 15, Gupta Judg., PgID 4589). His False Claims Act liability, three times his restitution, is $30,493,659.00.

A jury found Nabila Mahbub guilty of healthcare fraud conspiracy, and the district court ordered restitution of $3,176,470.50. (Ex. 32, Mahbub Verdict, PgID 2378); (Ex. 14, Mahbub Judg., PgID 6588). Her False Claims Act liability, trebled, is $9,529,411.50. Mahbub has appealed and the Sixth Circuit remanded for the district court to reconsider a *Batson* challenge—*see Mahbub*, 818 F.3d at 228—but her conviction remains in place at this time. Accordingly, she is estopped from challenging her liability under the Act. *See Szilvagyi*, 398 F. Supp. 2d at 847 (holding that a pending appeal does not bar the estoppel effect of a criminal conviction; defendants could move for relief from their False Claims Act judgments under Federal Rule of Civil Procedure 60 if their criminal convictions were subsequently overturned).

Dr. Pramod Raval was found guilty of healthcare fraud conspiracy by a jury in a parallel criminal proceeding involving the same conduct as alleged in this case. (Ex. 33, Raval Verdict, PgID 2192). Before he could be sentenced, however, Dr. Raval passed away; in light of his death, following Sixth Circuit guidance, the government moved to dismiss his conviction. (Ex. 34, Mot. to Vacate Conviction, PgID 4460–61) (citing *United States v. Toney*, 527 F.2d 716, 720 (6th Cir. 1975)) (vacating judgment because of defendant's death pending appeal and remanding to

16

district court to dismiss indictment). The district court granted the motion. (Ex. 35, Order vacating conviction, PgID 4564–65). Dr. Raval's death should not mitigate the collateral estoppel effects of his criminal verdict on this False Claims Act case. *See* 31 U.S.C. § 3731(e). Nonetheless, as argued in the subsequent section, even if estoppel does not apply, there is no genuine issue of material fact as it pertains to Dr. Raval's liability under the False Claims Act.

As to the corporate defendants, the Court entered defaults against the seven home healthcare agencies and the lone rehabilitation company. (*See* Dkt. ## 262, 264, 266, 269–71, 277, 283). Below, the government provides the Medicare losses attributable to each corporate defendant, and lists the appropriate treble damages:

| Defendant | Medicare Loss due to fraud | Treble Damages |
|---|---|---|
| Acure Home Care, Inc. | $2,827,351.29 (Ex. 11, Decl. of Patricia O'Neill, at ¶ 11) | $8,482,053.87 |
| All American Homecare, Inc. | $5,480,916.46 (*Id.*) | $16,442,749.38 |
| Care Plus Home Health Care, Inc. | $918,373.94 (*Id.*) | $2,755,121.82 |
| Embrace Home Health Care | $1,221,276.01 (*Id.*) | $3,663,828.03 |
| Family Alliance Home Healthcare, LLC | $1,703,902.40 (*Id.*) | $5,111,707.20 |
| Golden Age Home Health Care, Inc. | $1,467,318.70 (*Id.*) | $4,401,956.10 |
| Patient Choice Home Healthcare, Inc. | $8,597,058.13 (*Id.*) | $25,791,174.39 |
| Total Care Physical Therapy & Rehabilitation, Inc. | $462,979.83 (*Id.*) | $1,388,939.49 |

**B.    All Medicare billings involving Medicare patients churned through Shahab's home healthcare agencies—whether by the agencies, physical therapists, or the certifying physicians—are tainted by kickbacks**

Given the entries of default, the collateral estoppel effects of prior criminal convictions for the same conduct, and settlements in this case, there are only two or three defendants for whom the Court must determine liability under the False Claims Act, depending on how the Court rules as to Dr. Raval: (1) Dr. Paul Petre, (2) Dr. Victor Savinov, and (3) Dr. Pramod Raval (his estate).

Shahab had a quid pro quo relationship with all three doctors. Specifically, the doctors would certify and re-certify Medicare beneficiaries for home healthcare services by Shahab's agencies, and in return, the doctors would bill Medicare for the patient visits and any services they provided during the visits. (Ex. 9, Shahab Dep., at 19:18–21:20) (details of quid pro quo arrangement with Dr. Raval); (Ex. 36, Trial Tr., PgID 1588–94) (same); (Ex. 9, Shahab Dep., at 23:11–24:13) (details of quid pro quo arrangement with Dr. Petre); (Ex. 37, Petre Dep., at 12:2–13:14, 18:7–19:2, 19:15–25, 22:7–18, 25:18–21, 45:12–46:20, 68:11–15) (Dr. Petre admitting to receiving patient referrals from Shahab—for whom he could bill Medicare—in return for certifying patients for home healthcare); (Ex. 9, Shahab Dep., at 28:15–29:17) (details of quid pro quo arrangement with Dr. Savinov); (*see also* Ex. 49, Case No. 11-cr-20052, Trial Tr., Dkt. # 136, PgID 1047–54, 1059–60) (Medicare patient describing Shahab patient recruiter Laura Barrett taking him to

18

see Dr. Savinov with a group of other Medicare beneficiaries, and Dr. Savinov signing blank forms); (Ex. 50, Trial Tr., Dkt. # 152, PgID 2353–54, 2378–79) (Employee for All American and Acure testifying that she saw Savinov's name on blank referral forms). These quid pro quo arrangements violated the Anti-Kickback Statute. (*See, e.g.*, Ex. 51, *United States v. Washington*, No. 2:10-cr-20202, 2013 WL 8178395, at *4 (E.D. Mich. Sept. 5, 2013) (describing kickbacks in violation of the Statute as including payments from Medicare that doctor received by billing patients for whom she had falsely certified for home healthcare); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000) (describing that arrangements violated the Statute when "*one purpose* of the payment was to induce referrals").

In fact, Shahab only had one source for certifications of existing patients: doctors who had illegal financial relationships with him. (Ex. 9, at 45:20–46:11). In addition, Shahab only had two sources for new beneficiaries: the same doctors and recruiters who paid Medicare beneficiaries to agree to receive home healthcare services. (*Id.* at 45:20–46:11). The relationship between Shahab's agencies and the three physicians was so explicit that the internal telephone directories for the agencies listed Drs. Raval, Petre, and Savinov as physicians for the agencies. (*Id.* at 37:8–39:7); (*see, e.g.*, Ex. 38, Acure Telephone Directories, at 2, 8, 11, 12, 14).

The Medicare claims data also bears out the quid pro quo relationship between Shahab's seven home health agencies and the physicians. When all seven

home health agencies' payments from Medicare are taken into account, Drs. Raval, Savinov, and Petre were three of the top four physician referrers. (Ex. 11, O'Neill Decl., at ¶ 13). Specifically, Shahab's seven agencies in total received $5,665,536.49 from Medicare based on claims for patients that Dr. Raval had certified for home healthcare, putting him in first; Dr. Savinov was second at $4,055,488.32; and Dr. Petre was fourth at $1,707,505.51. (*Id.*). As to individual agencies, Dr. Savinov was the highest referrer to Acure, Embrace, and Family Alliance. (*Id.* at ¶ 15). Dr. Raval was the highest referrer to All American, Care Plus, and Patient Choice. (*Id.*). Dr. Petre was the third highest referrer to Embrace, Family Alliance, and Patient Choice. (*Id.*).

In addition to the explicit quid pro quo relationships, Shahab paid other kickbacks to these physicians in violation of the Anti-Kickback Statute. For Dr. Raval, Shahab paid him cash to refer new patients to the home healthcare agencies. (Ex. 9, Shahab Dep., at 7:16–18). That is, Shahab paid Dr. Raval $50,000 per year to refer three to five new Medicare beneficiaries a week to his home healthcare agencies—"new" meaning beneficiaries for whom Shahab's agencies had not previously billed Medicare. (*Id.* at 16:12–17:24). Checks to Voak Marketing for $50,000 are examples of these payments. (Ex. 39, Trial Tr., PgID 5028–30, 5034– 38; (Ex. 12, Trial Tr., PgID 5048–51); (Ex. 40, Trial Tr., PgID 5319–24, 5453–56); (Ex. 45, Voak Mkt. Checks); (Ex. 46, Check to Raval); (Ex. 47, Summary of

payments to Raval); (Ex. 48, Voak Mkt. payments to Raval). As part of this arrangement, Shahab personally witnessed Dr. Raval sign blank forms certifying Medicare beneficiaries as qualifying for home healthcare services from Shahab's agencies. (Ex. 9, Shahab Dep., at 31:22–24). Shahab's partners and employees, such as Hassan Akhtar and Sherry Prescott, also witnessed this activity. (Ex. 41, Trial Tr., PgID 3614–16, 3658–64); (Ex. 42, Trial Tr., PgID 4751–54). This kickback arrangement lasted for several years, until Dr. Raval demanded more money than Shahab was willing to pay. (Ex. 12, Trial Tr., PgID 5056–60). In total, Shahab paid Dr. Raval $250,000 in kickbacks. (Ex. 9, Shahab Dep., at 17:4–9).

For Dr. Petre, while there was not as formal an arrangement as there was with Dr. Raval, Shahab did pay Petre $110,000 in the form of a "loan," and Shahab expected Petre to send him new patients in return. (*Id.* at 21:21–24:24). Dr. Petre admitted that he received this "loan" in return for patient referrals to Shahab's agencies. (Ex. 37, Petre Dep, at 32:5–34:2). Shahab believes he received fourteen or fifteen new patients from Dr. Petre, (Ex. 9, at 19:3–17, 21:21–23:15), for which Dr. Petre admits he was also paid $400 to $600 per patient. (Ex. 37, at 25:22–27:4). In addition, Shahab paid Petre $2400 to speak to a group of Medicare beneficiaries about the benefits of going to Shahab's home healthcare agencies, providing an added incentive that Dr. Petre could pick up new patients. (*Id.* at 22:19–23:21, 25:5–21). Dr. Petre further admitted that he never certified any

beneficiaries for Shahab's agencies based on a belief that the agencies provided quality services; rather, he referred them to Shahab's agencies only because Shahab was sending him patients in return, for whom Petre could bill Medicare. (*Id.* at 28:5–14, 31:4–11, 31:21–32:4, 65:16–66:9).

As for Dr. Savinov, Shahab paid for his office space for three or four months, at a value of $500 per month, and paid for an administrative assistant for a few months. (Ex. 9, Shahab Dep., at 26:9–25, 27:16–30:22). At his deposition, Dr. Savinov invoked the Fifth Amendment in response to essentially every question, including those seeking information about these kickback arrangements. Therefore, the adverse inference rule applies, and the Court can reasonably conclude that any information Dr. Savinov has would not be exculpatory on the kickback issue. *See, e.g.*, *United States v. Marder*, 208 F. Supp. 3d 1296, 1304–06 (S.D. Fla. 2016) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)) (holding that the government is entitled to adverse inferences against defendant in a civil case for invoking Fifth Amendment right, where "the inference is complementary to the evidence presented by the Government"); *United States v. Bauer*, No. 14-cv-1660, 2014 WL 5493184, at *2, n.3 (M.D. Penn. Oct. 30, 2014) (same) (citing *In re Grand Jury*, 286 F.3d 153, 160–61 (3d Cir. 2002)); *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 632–35 (E.D. Va. 2006).

Specifically, Dr. Savinov invoked the Fifth Amendment at his deposition

and refused to answer: (1) how he got involved with home health care; (2) whether he met Shahab and had conversations regarding referring patients to each other; (3) whether Shahab paid him cash or other benefits in return for referring patients to Shahab's home healthcare agencies; (4) whether Dr. Raval instructed him on how to make money doing home healthcare; and (5) whether he knew anything about Shahab's business practices. (Ex. 43, Savinov Dep, at 18:5–16, 19:2–16, 20:10–19, 22:19–23:25, 25:21–26:21, 39:2–40:13, 45:6–11, 61:24–62:3). Because the evidence the government has presented is complementary to these invocations of the Fifth Amendment, the government is entitled to adverse inferences against Dr. Savinov with regard to his kickback arrangements with Shahab.

The facts of this case for Drs. Savinov, Petre, and the Estate of Dr. Raval are similar to those in a Seventh Circuit case involving a quid pro quo relationship between a home health agency and a physician. *See United States v. Patel*, 778 F.3d 607 (7th Cir. 2015). In the *Patel* case, a physician routinely prescribed home health care services for his patients, and he had been receiving undisclosed payments from Grand Home Health Care. *Id.* at 608–09. At the close of his criminal trial, he moved for a judgment of acquittal, contending that he had not "referred" any patients to Grand because "there was no evidence that he steered or directed his patients to Grand"; he also argued there was insufficient evidence that he "was paid 'in return for' certifications, as required by the statute." *Id.* at 609.

The Seventh Circuit in *Patel* disagreed. First, it held that by signing the Medicare 485 forms for certifying and recertifying patients for home healthcare at Grand, he was "referring" them to that agency. *Id.* at 612–13, 616. Second, because the physician received kickbacks in return for making referrals—regardless of whether the kickbacks were paid before or after the referrals—he had willfully and knowingly received a kickback. *Id.* at 618–19. Consequently, the Seventh Circuit found that the physician had violated the Anti-Kickback Statute through the quid pro quo relationship he had with the Grand agency. *Id.* at 619.

The same is true in this case. Drs. Petre, Raval, and Savinov received kickbacks in various forms: (1) the ability to bill Medicare for patient visits, (2) monetary payments, (3) "loans," (4) free office space, and (5) paid staff. In return, they referred patients to Shahab's home healthcare agencies by signing Form 485 certifications to his agencies. All of this evidence establishes that there is no genuine issue of material fact that Drs. Petre, Raval, and Savinov violated the Anti-Kickback Statute, 42 U.S.C. § 1320a–7b(b)(1), by "knowingly and willfully solicit[ing] or receiv[ing] … remuneration … in cash or in kind … in return for referring an individual to a person for the furnishing" of health care services paid for, in whole or in part, by a federal health care program.

Because Drs. Raval, Petre, and Savinov violated the Anti-Kickback Statute, they have violated the False Claims Act. *See United States ex rel. Kosenske v.*

*Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009); *United States ex rel. McNutt v. Haleyville Med. Supps., Inc.*, 423 F.3d 1256, 1259–60 (11th Cir. 2005); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997). Indeed, a provider can only bill Medicare after attesting that he or she did not violate the Anti-Kickback Statute. (Ex. 1, Dailey Aff., at ¶ 12). The Court should enter treble damages against Drs. Raval, Petre, and Savinov, which, respectively, is $16,996,609.47; $12,166,464.96; and $5,122,516.53.

## V.   CONCLUSION

For the reasons stated above, there is no genuine issue of material fact that all defendants in this case violated the False Claims Act, and that the three physician defendants violated the Anti-Kickback Statute, and by extension, the False Claims Act. The government respectfully requests that the Court impose treble damages against each defendant, as required by the False Claims Act.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s/Brandon C. Helms*
Brandon C. Helms
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan  48226
Phone:  (313) 226.9639
Email: Brandon.Helms@usdoj.gov

Dated:  March 9, 2018

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on March 9, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification to all counsel of record.

I further hereby certify March 9, 2018, I served the foregoing paper on the following via U.S. mail:

> Chiradeep Gupta
> Register No. 44701-039
> FCI Oakdale I
> P.O. Box 5000
> Oakdale, LA 71463

> _/s/Brandon C. Helms_
> Brandon C. Helms
> Assistant United States Attorney